UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                 :     **OPINION AND ORDER**
IN RE SEPTEMBER 11TH LIABILITY    :     **REGULATING INSURANCE**
INSURANCE COVERAGE CASES      :     **OBLIGATIONS**
                                 :
                                 :     03 Civ. 00332 (AKH)
                                 :
------------------------------------------------------X

ALVIN K. HELLERSTEIN, UNITED STATES DISTRICT JUDGE:

      This Opinion discusses whether the insurers who covered the lessees of Towers

One and Two of the World Trade Center on September 11, 2001 against loss and liability,

excluded defense costs from their coverage. I ruled earlier in this lawsuit that New York's

insurance law did not prevent these insurers from asserting the exclusion of defense costs as a

defense. See In re September 11th Liab. Ins. Coverage Cases, 333 F. Supp. 2d 111, 126

(S.D.N.Y. 2004). Having lost that motion, the lessees conducted a full course of discovery

seeking to prove that the insurance binders and policies in effect on September 11, 2001 did not,

in fact, contain the exclusion. The indisputable evidence shows, however, clearly and

indisputably, that, with the exception of one excess insurer, the insurers refused to extend

coverage for defense costs, and issued insurance binders or policies that explicitly excluded

defense costs. Although the lessees continued to negotiate for defense costs to be included, and

although the insurers did not foreclose the possibility that their policies might add defense

coverage at a later time, the insurers did not bind to cover defense costs as of the date of liability

and loss, September 11, 2001, when the terrorist-related aircraft crashes into Towers One and

Two occurred. Since there are no material issues to be tried, and in the context of motions for

summary judgment brought by all parties, I grant the insurers' motions for summary judgment,

with one exception, and I deny the lessees' motion for summary judgment with regard to the issue of defense costs.

## I. BACKGROUND

### A. The Lease Agreements and Relevant Insurance Policies

In early 2001, the Port Authority of New York and New Jersey (the "Port Authority"), the owner and operator of the properties constituting the World Trade Center, entered into agreements with real estate developer Larry A. Silverstein, by and through various of his wholly owned companies (collectively the "Silverstein Entities" or "Silverstein"[1]), to lease Buildings 1, 2, 4, and 5 of the World Trade Center. See Liab. Ins. Coverage Cases, 333 F. Supp. 2d at 120-21. Under the terms of these proposed lease agreements (collectively the "WTC Leases"), Silverstein was required to obtain liability insurance coverage. (See Zurich 56.1 Statement ¶ 7.) And so, working primarily with insurance broker Willis North America ("Willis"), Silverstein, acting through Silverstein Properties, set about obtaining the needed insurance at the primary, umbrella and excess levels.[2]

On the eve of September 11, 2001, Silverstein had managed to secure various levels of insurance. Both primary and umbrella insurance coverage were obtained through Zurich American Insurance Company ("Zurich"), but the policies remained in binder

---

[1] The Silverstein Entities include World Trade Center Properties LLC; 1 World Trade Center LLC; 2 World Trade Center LLC; 4 World Trade Center LLC; 5 World Trade Center LLC; Silverstein WTC Mgmt Co. LLC; Silverstein Properties, Inc.; Silverstein WTC Facility Manager LLC; Silverstein WTC LLC; Silverstein WTC Properties LLC; Larry A. Silverstein; WTC Investors LLC; 1 World Trade Center Holdings LLC; 2 World Trade Center Holdings LLC; 4 World Trade Center Holdings LLC; and 5 World Trade Center Holdings LLC.

[2] Primary insurance coverage attaches immediately upon the happening of an occurrence covered by the terms of the policy. See American Home Assur. Co. v. Republic Ins. Co., 984 F.2d 76 (2d Cir. 1993), cert. denied, 508 U.S. 973 (1993) (citing Ostrager & Newman, Handbook on Insurance Coverage Disputes, § 6.03[a] (5th ed. 1992)). Excess, or secondary, insurance is coverage that attaches only after a predetermined amount of underlying primary insurance has been exhausted. See id. at 77. Umbrella insurance coverage serves the dual role of both primary and excess insurance. Thus, umbrella policies "are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage)." Commercial Union Ins. Co. v. Walbrook Ins. Co., 7 F.3d 1047 (1st Cir. 1993).

form as of September 11.  In addition to primary and umbrella coverage, the Silverstein Entities also secured seven layers of excess insurance above the primary and umbrella policies. However, not every excess insurer proceeded along the same track for negotiations, binding, and issuing of policies.  Some excess policies were issued before September 11, 2001, and some after.

Thus, as of September 11, Silverstein had secured several layers of insurance coverage, aggregating $1 billion, best depicted as a "tower" of insurance:[3]

---

[3]      The coverage amounts are written in shorthand to be read as follows:  "p/o" stands for "per occurrence" and "xs" stands for "excess."  Thus, for example, "20M p/o 200M xs 265M" reads $20 million per occurrence, $200 million aggregate, in excess of $265 million."

| Layer | Insurer | Coverage | Aggregate Coverage |
|---|---|---|---|
| 8[4] | ACE Bermuda Ins. LTD | 100M xs 900M | $1 billion |
| 7 | ACE Bermuda Ins. LTD | 100M p/o 435M xs 465M | $900 million |
| | #Chubb Atlantic Indem. LTD | 60M p/o 435M xs 465M | |
| | Gerling-Konzern Allgemeine | 50M p/o 435M xs 465M | |
| | XL Insurance (Bermuda) Ltd. | 125M p/o 435M xs 465M | |
| | Zurich Int'l Bermuda | 100M p/o 435M xs 465M | |
| 6 | AXA Corporate Solutions Ins. | 20M p/o 200M xs 265M | |
| | National Surety Corp. | 30M p/o 200M xs 265M | |
| | Liberty Mutual Ins. Co. | 50M p/o 200M xs 265M | $465 million |
| | Ohio Casualty Ins. Co. | 50M p/o 200M xs 265M | |
| | Royal Ins. Co. | 25M p/o 200M xs 265M | |
| | St. Paul Indemnity Ins. Co. | 25M p/o 200M xs 265M | |
| 5 | Athena Assurance Co. | 25M p/o 115M xs 150M | |
| | Great American Ins. Co. | 50M p/o 115M xs 150M | $265 million |
| | Great American Assurance Co. | 40M p/o 115M xs 150M | |
| 4 | U.S. Fire Ins. Co. | 25M xs 125M | $150 million |
| 3 | General Star Nat'l Ins. Co. | 25M xs 100M | $125 million |
| 2 | Gulf Ins. Co. | 25M p/o 50M xs 50M | $100 million |
| | Lumbermens Mutual Cas. Co. | 25M p/o 50M xs 50M | |
| 1 | Zurich Umbrella | 50M p/o xs primary | $50 million |
| Base | Zurich Primary | 2M p/o and 4M aggregate | $2 million |

The essential question presented by the instant litigation is whether the various insurers have a duty to defend the Silverstein Entities, and any additional insureds, according to the specific language of each insurer's agreement, by binder or by the provisions of a final policy.

---

[4] The insurance coverage set forth in layers 7 and 8, and the disputes relevant to such alleged coverage, is not addressed by this Opinion for lack of jurisdiction.

*B. The Initial Issue as to the Scope of Insurance Coverage*

Pursuant to section 405(c)(3)(B) of the Air Transportation Safety and System Stabilization Act, Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. §§ 40101 note), those who were injured in and around Towers One and Two, and the legal successors of those who were killed in the airplanes and in and around the Towers, were given a choice of seeking compensation from a specially-created Victim Compensation Fund, or filing suit in the United States District Court for the Southern District of New York. Approximately 300 lawsuits were filed by or on behalf of persons killed or injured in or around the Towers, alleging varying breaches of duties of care by the Port Authority or its lessees. These cases were assigned to me, and subsequently consolidated in In re September 11th Litigation, 21 MC 97.

The Silverstein Entities, defendants in those actions, then instituted a third-party action against Zurich seeking a declaration of Zurich's obligations to itself and to other asserted insureds, including the Port Authority. Zurich, in turn, filed a fourth-party action together with an original complaint against the Silverstein Entities, the Port Authority, the excess insurance carriers, and the Westfield Entities,[5] raising the same issues as to its obligations under the Primary and Umbrella policies. The Westfield Entities then brought their own claims against the excess carriers. These various actions were consolidated in In re September 11th Liability Insurance Coverage Cases, 03 Civ. 0332.

Following consolidation, the Port Authority and the Silverstein Entities brought motions for judgment on the pleadings pursuant to Rule 12(c), Fed. R. Civ. P., on basic issues concerning their insurance coverage: (1) whether the Port Authority was entitled to the status of an additional insured and the scope of that coverage; and (2) whether New York insurance law

---

[5] The Westfield Entities include Westfield WTC LLAC (n/k/a WTC Retail LLC), Westfield WTC Holding LLC, Westfield Corporation, Inc., and Westfield America, Inc. The Westfield Entities, through a Westfield affiliate, leased the retail concourse and subgrade area that contained the retail mall of the World Trade Center Complex.

mandated that the Policies, which expressly excluded defense costs, required the insurers to provide for a defense.  See Liab. Ins. Coverage Cases, 333 F. Supp. 2d at 111. I denied both motions.

Determining that Zurich's Binder, rather than the Policy it issued following September 11, was the operative document, I held that the Binder was ambiguous as to whether the Port Authority was intended as an additional insured.  Liab. Ins. Coverage Cases, 333 F. Supp. 2d at 123.  Silverstein also sought a declaration that, pursuant to New York State Insurance Regulation 107 ("Regulation 107"), 11 N.Y.C.R.R. § 71 (2003), Zurich was obligated to provide coverage for defense costs as a necessary consequence of providing coverage for loss or liability, regardless of any intention to disclaim coverage for defense costs.  Id.  I held that Regulation 107 did not require me to rewrite the Policy, and that to do so would "confer a windfall on WTCP, granting Silverstein that which he could not obtain in negotiations."  I held that court intervention without a fully developed record was inappropriate.  Id. at 126.

C.  The Current Dispute as to the Duty to Defend

The parties then engaged in full discovery, following which all parties—the Port Authority, the Silverstein Entities, Zurich, and the various excess insurers—filed motions for full or partial summary judgment.  The motions sought declarations as to the status of the Port Authority and the Westfield entities as additional insureds, the priority among the several towers of insurance, and whether Zurich and the excess carriers had assumed a duty to defend Silverstein and any additional insureds.

Following oral argument, several of the issues presented by the various motions dropped out of the case.  The Port Authority reached a settlement with Zurich and the excess carriers recognizing the Port Authority's status as an additional insured under the binders and the

subsequently-issued policies.  See Amended Order, 03 Civ. 0332, dated October 31, 2005.

Similarly, the Westfield entities reached a settlement with Zurich clarifying their status as

additional insureds.  See Order, 03 Civ. 0332, dated May 26, 2006.  Finally, during oral

argument, I concluded that a determination as to the priority of insurance between the tower of

insurance led by Zurich and other towers of insurance covering the Port Authority and any

related parties was premature, and therefore declined to consider this issue on the motions for

summary judgment.[6]  Thus, the issue remaining for my consideration in this Opinion is whether

the coverage obtained by Silverstein in the Zurich tower provided for defense cost coverage.

## II.  STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is warranted if the "pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits . . . show that there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter

of law."  Fed. R. Civ. P. 56; accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A

"genuine issue" of "material fact" exists "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986).  Although all facts and inferences therefrom are to be construed in favor of the party

opposing the motion, see Harlen Assocs. v. Village of Mineola, 273 F.3d 494, 498 (2d Cir.

2001), the non-moving party must raise more than just a "metaphysical doubt as to the material

facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  "[M]ere

speculation and conjecture is insufficient to preclude the granting of the motion."  Harlen, 273

F.3d at 499.  "If the evidence is merely colorable or is not significantly probative, summary

---

[6] At oral argument on September 12, 2005, I deferred judgment on the issue of priority of insurance, preferring instead to deal with the issue "in some form that is comprehensive and deals with all the implications and consequences, where all the parties have incentive to raise those implications and consequences."  (Transcript of September 12, 2005, 114:5-16.)  I therefore denied the motions as to priority of insurance without prejudice.

judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

## III. Duty to Defend Under the Zurich Primary Policy

*A. Procurement from Zurich of the Primary Policy[7]*

Silverstein, acting through his company, Silverstein Properties, engaged Willis to counsel it and procure the insurance required by the Port Authority and Silverstein's financers and investors. Craig D. Simon, Willis' casualty practice leader in its New York office, led the negotiations for Silverstein Properties, along with Robert Strachan, Risk Manager for Silverstein Properties. They began their efforts in March and April of 2001, meeting with Barry Glick, a member of the Port Authority's Law Department. Simon advised Strachan and Glick that coverage for defense costs might be difficult to obtain, for potential insurers would want accurate loss history data dating back "at least five years," (Kelly Affirmation, Ex. B at 89:16-25 (the "Simon Dep.")) and that the available data was "woefully lacking." (Simon Dep. at 113:24-114:5.)[8] Simon told Strachan and Glick that he believed that Silverstein would be "unable to provide allocated loss expense in the program," and thus would be unable to secure defense cost coverage.[9] (Simon Dep. at 164:5-10.)

Simon opened negotiations with Zurich, working with Zurich underwriters Dennis Zervos, Lynn Maier and Mark Elias, among others. The Zurich team told Simon that without more accurate loss history data, defense cost coverage would not be provided—the very problem that Simon had anticipated. (See Kelly Affirmation, Ex. C at 215:21-216:22 ("Maier Dep."); Ex.

---

[7] The primary insurance issued by Zurich was in the form of a comprehensive general liability ("CGL") policy. The terms Primary Policy and CGL Policy will be used interchangeably.

[8] The data was lacking because it appeared that the Port Authority defended itself and was benefited by a sovereign immunity defense.

[9] Allocated losses, also referred to as Allocated Loss Adjustment Expenses ("ALAE"), refer to the costs incurred by the insurer in providing for defense of the insured party. In order to adequately determine the extent of costs that would be incurred, insurers require the insured to provide relevant loss history data.

D at 148:17-25 ("Zervos Dep.").)  Zervos made clear that Zurich would not cover defense costs, explaining that "the coverage of the allocated loss adjustment would be outside the program[, o]utside the SIR endorsement and totally the insured's responsibility."  (See Zervos Dep. at 225:17-20.)

On June 8, 2001, Willis submitted Silverstein's application for insurance coverage to Zurich and other potential insurers.  The submission sought defense cost coverage and provided additional loss history data.  (See Kelly Affirmation, Ex. E at Willis-LIA 00302-00314.)  Zurich responded by an email to Simon on June 20, 2001, asking if Silverstein's submission indeed sought coverage for defense costs: "[w]ill CGL's $100K SIR[10] (ea/every) include defense within limits?."  (See Erlandson Decl., filed July 11, 2005 (Erlandson Decl. II), Ex. 5 at Zurich (M) 1163-66.)  Simon answered, "No.  Defense is outside the limits and outside the SIR."  (Id. at Zurich (M) 1164.)

On July 6, 2001, Zervos emailed Simon with the two options that Zurich was willing to provide.  (See Kelly Affirmation, Ex. F.; Erlandson Decl. II, Ex. 28, Simon Deposition, 345:9-14.)  Neither option included coverage for defense costs.  Both options provided a self-insured retention of $100,000 (i.e., the first $100,000 of claims of loss were not to be insured); and each option offered a greater, or lesser, deductible and consequent difference in premium.  The email provided as follows:

As per our conversation, the quote is as follows:

---

[10] As discussed in my earlier Opinion, September 11th Liability Insurance Coverage Cases, 333 F. Supp. 2d at 124, a self insured retention ("SIR") "differs from a deductible in that a SIR is an amount that an insured retains and covers before insurance coverage begins to apply.  Once a SIR is satisfied, the insurer is then liable for amounts exceeding the retention less any agreed deductible.  See Barry R. Ostrager & Thomas N. Newman, Handbook on Insurance Coverage Disputes § 13.13[a] (12th ed. vol.2 2004).  Policyholders frequently employ SIRs to forego increased premiums where they face high frequency, low severity, losses.  See CSX Transp. Inc. v. Continental Ins. Co., 343 Md. 216, 680 A.2d 1082, 1096 (1996).  In contrast, a deductible is an amount that an insurer subtracts from a policy amount, reducing the amount of insurance.  With a deductible, the insurer has the liability and defense risk from the beginning and then deducts the deductible amount from the insured coverage.  Ostrager & Newman, Handbook on Insurance Coverage Disputes, § 13.13[a]."

Option #1:
$100,000 SIR & $150,000 Deductible Total Retention $250,000 **Excluding Allocated Loss Adjustment Expense.**
**Total Policy Premium $1,033,581.** with 10% commission.

Option #2:
$100,000 SIR & $400,000 Deductible Total Retention $500,000 **Excluding Allocated Loss Adjustment Expense.**
**Total Policy Premium $692,569.** with 10% commission.

Lynn will be sending a formal quote letter on Monday July 9, 2001 addressing the following:

- Coverages
- Exclusions
- RIMS Additional Charges
- Loss Funds (escrows)
- Letter of Credit – Need the Silverstein financial's
- TPA quote from ZSC

The clause, "Excluding Allocated Loss Adjustment Expense," meant that "allocated loss adjustment expense was not going to be covered, would not be something that would be paid by Zurich." (Kelly Affirmation, Ex. B., Simon Dep. at 351:24-352:3.) Meanwhile, the closing date for the World Trade Center lease was fast approaching and, without offers from any other insurers, Silverstein decided to proceed with the primary coverage offered by Zurich.

On July 10, 2001, Maier sent a quote to Simon providing for "each occurrence" limits of $2 million and a "general aggregate" limit of $4 million. As to defense costs, the quote provided:

Defense Cost in addition to the Limit of Liability
ALAE—Outside the SIR/Deductible and paid / reimbursed 100% by the insured.

The quote provided also that general liability coverage form CG 00 01 (07 98) would be used for the text of the policy. The standard text of the form, which was not attached to Maier's quote, included a duty to defend. The form contained a clause providing that the insurer would "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily

injury' or 'property damage,'" and would "have the … duty to defend the insured against any 'suit'" seeking such damages.  Commercial General Liability Coverage Form, CG 00 01 10 01, Section I, 1 (July 1998).

Simon circulated Zurich's July 10 quote to Strachan of Silverstein Entities and to Nancy Townsend, Westfield's District Manager.  Simon's cover memo explained that Zurich still viewed the loss data as "not credible by the insurance marketplace" and that it therefore declined to provide defense cost coverage, (Kelly Affirmation, Ex. I at WILLIS 32149) but that it might be amenable to providing defense costs at some later point after clear loss data became available.  (See id.)

Despite Simon's explanation in his circulation of the July 10 quote that defense costs were excluded, Townsend stated the opposite, writing, in an email of July 13, 2001, after she received Simon's explanation of July 10, that the Zurich policy did "include defense costs and expenses in excess of the retention."  (Erlandson Decl., filed June 14, 2005 ("Erlandson Decl. I"), Ex. 11 at Zurich 4088.)  Townswend's email led to a response by Cynthia Glist, from Westfield, interpreting Zurich's quote as not "indicat[ing] whether defense expenses erode the SIR or not."  (Id. at 4086.)  The email was ultimately sent to Maier at Zurich as part of an email chain from Townsend addressing various aspects of the primary policy.  (Id. at 4085.)  Zurich did not respond further.

Simon's subsequent email of July 17, 2001 to Strachan and Townsend, explained why Zurich excluded defense costs:

> … The only way carriers would provide ALE within the SIR would be to actually audit the Port Authority files. …
>
> With loss data seen as not credible by the underwriters and NO ALE information, underwriters would be working in a vacuum and the resulting premium would be many multiples of the current premiums.  Please keep in mind that the terrorist

bombing in 1993 is seen as the MFL [maximum foreseeable loss] and we were not provided any information to share with underwriters.

Zurich has been very agreeable to revisit their position after they have some time on the risk. …

(Kelly Affirmation, Ex. L at WTC2 022273.)

The Zurich binder was issued on July 18, 2001 under the terms set forth in the July 10 quote, effective July 19, 2001 through July 19, 2002, for $2 million each occurrence, with a general aggregate liability of $4 million.  (Kelly Affirmation, Ex. M at WILLIS-LIA 02083-02085 ("Primary Binder").)  The Binder excluded defense costs:

Defense Cost in addition to the Limit of Liability
ALAE—Outside the SIR/Deductible and paid / reimbursed 100% by the insured.

The Binder also contained reference to General Liability Coverage Form CG 00 01 (07 98), as in the July 10 quote.  Simon explained to his client, Strachan, and to Townsend of Westfield why he was not able to obtain defense cost coverage:  "the insurance marketplace could not develop a loss projection based on the loss data provided to us from the NY/NJ Port Authority." (Kelly Affirmation, Ex. N.)

Strachan expressed once again Silverstein's desire for defense cost coverage, (see Kelly Affirmation, Ex. B, Simon Dep. at 601:6-20), this time in a conference call on August 1, 2001 with the various representatives of Willis, Silverstein's insurance broker, and Zurich: Craig Simon, Robert Grella (the producer at Willis responsible for the Silverstein account), and Timothy Crowley (the Willis account executive managing the Silverstein account), and Zurich's Maier, Elias, and Curcio-Elias.  Simon told Strachan that he could not obtain defense cost coverage, that Zurich needed a "a history, we would need to see a track record about what the allocated claim expenses actually were before we could consider changing the way the program

was either for this year or for the subsequent year." (Kelly Affirmation, Ex. Y, Elias Dep. at

223:10-20.) Maier's notes from the call state:

> -- Strachan – wanted to know why Zurich would not provide ALAE coverage + if we would reconsider.

> Zurich did not provide ALAE coverage due to the following:

> -- No loss history fo[r] ALAE. Port Authority handled claims.

> -- Port Authority had immunities that Silverstein does not have.

> It was agreed to entertain coverage for ALAE in the future – after ALAE data on this year's program became available for review.

Elias of Zurich made it clear that Zurich would not agree to pay defense costs under the Primary

Policy. (Kelly Affirmation, Ex. Y, Elias Dep. at 223:21-224:4.)

On November 16, 2001, two months after the terrorist-related aircraft crashes of

September 11, 2001, Zurich issued its Primary Policy. (See Kelly Affirmation, Ex. P ("Primary

Policy") at WILLIS-LIA 02246.) The Primary Policy expressly excluded defense costs, stating:

> Except for any "defense costs" that we may elect to pay, you shall pay all "defense costs," both within and excess of the Per Occurrence or Per Claim Self Insured Retention Amount, subject to application of the Aggregate Amount, if applicable.

(Id. at WILLIS-LIA 02247.)

*B. The Insurance Binder is the Effective Instrument*

On September 11, 2001, the Primary Binder was the only operative written

instrument governing the insurance liabilities and obligations of the Silverstein Entities and

Zurich. The final Primary Policy was not issued until November 16, 2001. As I held earlier,

Liab. Ins. Coverage Cases, 333 F. Supp. 2d at 119-20, the insurance binder, rather than the

policy, was the legally effective instrument.

Under established New York law, an insurance binder provides for interim insurance until the parties set or refuse a final policy. Id. When a loss occurs prior to issuance of a final policy, the binder in effect at the time of the loss governs. Id. at 120 (citing World Trade Ctr. Props., 345 F.3d 154, 183 (2d Cir. 2003)). Here, the Binder issued on July 18, 2001 and was the governing contract between the parties on September 11, 2001.

Because binders are, by definition, not full documents sufficiently complete to create binding agreements, courts must often look beyond the plain terms of the binder to discern the precise scope of the liabilities and obligations under the insurance plan in the event that a loss occurs prior to issuance of the final policy. Id. To ensure that the binder comports with the intent of the parties, courts will consider: "(1) the specific terms contained in the binder or incorporated by reference, and (2) to the extent necessary as gap-fillers, the terms included in the usual policy currently in use by the insurance company or those required by statute." World Trade Ctr. Props., 345 F.3d at 169 (citing La Penta v. Gen. Acc. Fire & Life Assurance Corp., 404 N.Y.S.2d 182, 184 (4th Dep't 1978)); see also Liab. Ins. Coverage Cases, 333 F. Supp. 2d at 120. Outside of the specific terms included in the binder and the standards established by the insurance industry or by statute, courts will also look to "the parties' negotiations to determine what terms the parties intended to incorporate in the binder." Liab. Ins. Coverage Cases, 333 F. Supp. 2d at 120 (citing World Trade Ctr. Props., 345 F.3d at 169). The objective expectations of the parties is what counts—what they told each other, and not what each side may have discussed among themselves or subjectively wished to accomplish. See Korea Life Ins. Co. v. Morgan Guar. Trust Co. of New York, 269 F. Supp. 2d 424 (S.D.N.Y. 2003).

*C. The Duty to Defend under the Primary Policy*

Zurich and Silverstein each have brought separate motions for summary

judgment for a determination as to Zurich's obligation to provide defense cost coverage under its Primary Binder, providing $2 million in coverage per occurrence and $4 million in aggregate coverage with a $100,000 SIR per occurrence and a $150,000 deductible layer above the SIR.  I hold that the plain meaning of the Primary Binder and the objective intent of the parties, demonstrated over the course of their negotiations, shows that Zurich excluded coverage for defense costs, and that there is no material fact in dispute as to that intent.  The argument to the contrary is without merit.  As I previously held, I remain "unwilling to … rewrite the policies to include coverage for defense costs."  See Liab. Ins. Coverage Cases, 333 F. Supp. 2d at 126. The rewriting urged by the Silverstein Entities would give them a coverage that they were not able to obtain in negotiations, but which they continued to aspire to obtain, and would give them an unwarranted windfall for which they did not pay a premium.

1.  The Primary Binder:  Its Plain Meaning

The duty of an insurer to "provide a defense for claims asserted against its insureds is contractual, and the courts will therefore look to the language of the policy at issue to determine an insurer's defense obligations."  See Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 5.01 (12th ed. vol.2 2004).  As noted above, the Primary Binder is the controlling instrument setting out the obligations of Zurich as insurer and it is the language of the Binder that I first am to consider to determine Zurich's potential defense obligations.

Zurich contends that the language of the Binder, as set forth in the clause below, clearly and unambiguously memorializes the parties' intent to exclude defense cost coverage from the Primary Policy.

Defense Cost in addition to the Limit of Liability
ALAE—Outside the SIR/Deductible and paid / reimbursed 100% by the insured.

(Kelly Affirmation, Ex. M ("Primary Binder") at WILLIS-LIA 02093.)  The first line, Zurich

maintains, "defense cost in addition to the limit of liability," is generally understood within the

insurance industry to mean that "the limit of liability would just be indemnity; it wouldn't be

eroded by defense costs if the policy responded to it."  (Erlandson Decl. Reply to Zurich Opp.

(Erlandson Dec. III), Ex. 1, Elias Dep., at 167:8-10.)  The second line, "ALAE—outside the

SIR/Deductible and paid / reimbursed 100% by the insured," confirms the first line, Zurich

maintains, and unambiguously places responsibility for 100% of defense costs on Silverstein,

both within and above the SIR and deductible, as the insured party.

    The Silverstein Entities argue for a different meaning, that since the specifications

submitted to Zurich requested coverage for "defense costs in addition to the limit of liability,"

the insuring clause should be interpreted as granting that request.  Silverstein argues that the

second line refers only to defense costs within the SIR and deductible and does not address

defense costs in addition to the SIR and deductible.  Silverstein argues that if Zurich did intend to

impose 100% liability for defense costs on the Silverstein Entities, the Binder would have said so

more clearly.  (Silverstein Entities Reply Mem. at 24.)

    Silverstein's arguments are unpersuasive.  A plain reading of both lines clearly

places 100% of defense cost liability on the insured, both within and without the SIR and

deductible.  The first line, I hold, "defense costs in addition to the limit of liability," means just

what it says.  The policy limits are $2 million per occurrence and $4 million aggregate liability,

and defense costs are outside that and are not covered.  The second line, I hold, "ALAE—outside

the SIR/Deductible and paid / reimbursed 100% by the insured," means that the Allocated Loss

Adjusted Expense cannot consume the SIR, the first liability of $150,000 which belongs entirely

to Silverstein, nor the deductible of $250,000; both are to be paid or reimbursed entirely by Silverstein, the insured.

The Silverstein Entities argue also that reference in the Binder to the CG 00 01 (07 98) form imposes on Zurich the obligation to cover defense costs. As noted earlier, one of the terms in the general form requires the insurer to "pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage,'" and provides further that insurers "have the … duty to defend the insured against any 'suit'" seeking such damages. Commercial General Liability Coverage Form, CG 00 01 10 01, Section I, 1. However, implications by reference in the Binder need not be accepted if they directly contradict the plain meaning of the Binder and the plain understanding of the parties in negotiating the Binder. See World Trade Center Properties, 345 F.3d at 170; Ostrager & Newman, Handbook on Insurance Coverage Disputes § 1.01[d].

2. The Pre-Binder Negotiations

The parties' pre-binder negotiations, lasting several months, dispel any doubt arising from the incorporation of the Commercial General Liability Coverage Form that defense cost coverage was not to be included. The Zurich underwriting team made plain to Simon, Silverstein's broker, and Simon made plain to Silverstein, that the loss data provided by the Silverstein Entities was inadequate and that Zurich therefore would not cover defense costs or assume a duty to defend. The express language of the Zurich Binder excluding defense cost coverage reflected that agreement.

Under New York law, an insurance broker acts as the insured's agent in procuring the insurance policy. See Peerless Ins. Co. v. Young, 749 N.Y.S.2d 29, 30 (N.Y. App. Div. 2002); see also Standard Oil Co. v. Triumph Ins. Co., 1876 WL 10991 (N.Y.) *1; 2540 Assocs.

Inc. v. Assicurazioni Generali, S.p.A., 707 N.Y.S.2d 59 (N.Y. App. Div. 2000).  Willis was

Silverstein's agent, and Willis' and Simon's representations made during the course of

negotiations are binding on Silverstein.  See Standard Oil Co., 1876 WL 10991 at *1; see also

Falcon Crest Diamonds, Inc. v. Dixon, 655 N.Y.S.2d 232 (N.Y. Civ. Ct., 1996); Amalgamated

Mut. Cas. Co. v. Schultz, 207 N.Y.S.2d 890 (N.Y. Sup. 1960).  That which Simon understood

and said in procuring Zurich's Binder became, by operation of law, that which Silverstein

understood and said.

   The deposition testimony and various communications of Simon and the Zurich

underwriters, Maier and Zervos, make clear that the available loss data was considered

"woefully" inadequate and that, without more reliable information, Zurich would be unwilling to

provide defense cost coverage.  (See Simon Dep. at 164:5-10.; see also Maier Dep. at 215:21-

216:22; Zervos Dep. at 148:17-25.)  Indeed, throughout the negotiation process, Zervos made

clear that "the coverage of the allocated loss adjustment would be outside the program, Outside

the SIR endorsement and totally the insured's responsibility."  (See Zervos Dep. at 225:17-20.)

Simon repeatedly conveyed the Zurich position to Strachan and others at Silverstein, explaining

that defense coverage would not be provided in the absence of more reliable loss data.  (See

Kelly Affirmation, Ex. B., Simon Dep. at 351:24-352:3.)  After Zurich issued its initial quote,

and subsequently the Primary Binder, Simon continued to explain to Strachan repeatedly and, in

a conference call of August 1, 2001, to Silverstein directly, that Zurich was unwilling to assume

any duty to defend.  (See Kelly Affirmation, Ex. I at WILLIS 32149; Ex. L at WTC2 022273;

Ex. N; Ex. Y, Elias Dep. at 223:10-20.)  Elias of Zurich made clear that only at some future

point, after adequate loss statistics could be compiled from Silverstein's actual experience under

the lease, might Zurich be willing to include defense cost coverage.  (See id.)  The Zurich team

made clear, and Simon and Silverstein understood, that defense costs were not included in Zurich's insurance. That Silverstein continued to press its desire for such coverage is irrelevant. Simon, Strachan's agent, conducted the negotiations with Zurich, not Strachan.

Silverstein's continuing requests for coverage of defense costs led, on June 20, 2001, to an email from Keith Ragel, Zurich underwriter for the Umbrella Policy, to Simon asking if defense cost coverage was included in Silverstein's request for insurance. (See Erlandson Decl. II, Ex. 5 at Zurich (M) 1163-66.) Ragel's e-mail asked: "[w]ill CGL's $100K SIR (ea/every) include defense within limits?." Simon answered, "No. Defense is outside the limits and outside the SIR," (id. at Zurich (M) 1164), and it was only on that basis—Simon's assurance that Silverstein was not pressing its request for defense cost coverage—that Zurich was willing to extend liability coverage. Had Zurich not been willing to extend liability coverage, Silverstein would not have been able to close its transactions with the Port Authority, purchasing the leaseholds of the World Trade Center from the Port Authority.[11]

### 3. New York Insurance Law Does Not Impose a Defense Cost Obligation on Zurich

Once again, Silverstein argues that Regulation 107 of the New York Insurance Law requires the Binder to include coverage for defense costs regardless of the intention of the parties. I rejected Silverstein's argument when it was previously raised, declining then to "rewrite the policies to include coverage for defense costs." Liab. Ins. Coverage Cases, 333 F. Supp. 2d at 126. I ruled that to do so would "confer a windfall on [the Silverstein Entities],

---

[11] Silverstein argues also that where a term in an insurance contract is found to be ambiguous and its meaning cannot be ascertained through reliance on extrinsic evidence, such ambiguities "should be resolved in favor of the insured." McCotis v. Home Ins. Co., 31 F.3d 110, 113 (2d Cir. 1994). However, application of this rule "is 'generally inappropriate if both parties are sophisticated.'" DaPuzzo v. Globalvest Mgt. Co., 263 F. Supp. 2d 714, 719 (S.D.N.Y. 2003) (internal citations omitted). Further, it is inappropriate to rely on this rule when the intent of the parties can be discerned through reliance on extrinsic evidence. See Schering Corp. v. Home Ins. Co., 712 F.2d 4, 10, n. 4 (2d Cir. 1983).

granting Silverstein that which he could not obtain in negotiations." Id.  Silverstein has presented nothing to cause me to change my mind.

Regulation 107 of the New York Insurance Law provides that "[n]o liability insurance policy … shall be issued … in this State containing a provision that:  (1) reduces the limits of liability stated in the policy by legal defense costs; (2) permits legal defense costs to be applied against the deductible; or (3) otherwise limits the availability of coverage for defense costs."  11 N.Y.C.R.R. § 71.2(a).  Although the Regulation seemingly precludes the issuance of a policy that expressly rejects defense obligations, there are various exceptions that I noted in my earlier decisions, and nothing in the established case law of New York requires that I rewrite the Binder between Zurich and the Silverstein Entities—both large and sophisticated entities—to provide for defense cost coverage when the parties plainly intended to issue and accept liability insurance which, for good reasons, did not include such coverage.  See Liab. Ins. Coverage Cases, 333 F. Supp. 2d at 127-28.  "'[U]nder New York law, the effect of a violation of insurance regulations is determined by carefully balancing the equities of the parties,'" id. at 128 (quoting In re Ambassador Group, Inc. Litig., 738 F. Supp. 57, 65 (E.D.N.Y. 1990)), and the equities do not require me to rewrite the policies.

In the present case, judicial rewriting of the bargained-for insurance policy would impose on Zurich an obligation that it expressly rejected and would run directly counter to the admonition in World Trade Center Properties that, in contract interpretation, "the intentions of the parties should control."  World Trade Ctr. Props., 345 F.3d at 184 (internal quotations omitted).  The evidence is overwhelming that Zurich refused, in the absence of adequate loss history data, to issue a policy that included defense cost coverage.  To now impose a defense

obligation would give a windfall to Silverstein and subject Zurich to a liability that it was unable to calculate or prepare for by an appropriate premium, and thus would work a manifest injustice.

In accordance with the foregoing, I hold again that the language of the Binder and the parties' intentions clearly demonstrate that Zurich did not assume any duty to defend and I decline to impose a burden on Zurich that it never agreed to assume. The motion for summary judgment by Zurich as to the duty to defend under the CGL Policy is therefore granted.

## IV. DUTY TO DEFEND UNDER THE ZURICH UMBRELLA POLICY

*A. Procurement of the Umbrella Policy*

Contemporaneous with its negotiations to obtain primary insurance coverage, the Silverstein Entities also engaged in negotiations to obtain umbrella insurance. Working primarily with Zurich underwriters Keith Ragel and Doreen Miller, Simon and Strachan submitted their specifications as to umbrella coverage, specifically requesting inclusion of defense costs. (See Erlandson Decl., filed June 14, 2005 ("Erlandson Decl. IV"), Ex. 1 at WILLIS-LIA 03005.) As to defense cost coverage, the specifications they requested provided as follows:

> Defense:
>
> 1. First-dollar duty to defend if primary is exhausted and where no primary coverage exists.
>
> 2. Defense and other supplementary payments in addition to policy limits.

(Id.) Zurich, however, as it did with the specifications provided for the CGL Policy, immediately expressed concerns about the adequacy of the loss data provided by the Silverstein Entities. Ragel and Miller made clear to Simon that any quote for umbrella coverage would be for indemnity only. (See Kelly Affirmation, Ex. Q ("Ragel Transcript") at 292:5-23; Ex. R ("Miller Transcript") at 76:11-79:6.)

On June 8, 2001, Willis wrote again, providing such loss history data as it had available, and again requesting defense cost coverage. (See Erlandson Decl. IV, Ex. 3 at SM 0086-0094.) The information, however, did not satisfy Zurich's underwriters, and they again made clear to Simon that defense cost coverage would not be included in the CGL Policy. Simon continued his efforts to persuade Zurich's underwriters to grant coverage for "Defense Costs in Addition to Limit of Liability," but he did not succeed. (Kelly Opposition Affirmation, Ex. A ("Simon Transcript") at 253:20-255:7.) Ragel of Zurich clinched the point by his email to Simon of June 20, 2001, asking, "[w]ill CGL's $100K SIR (ea/every) include defense within limits?." (Erlandson Decl. II, Ex. 4 at Zurich (M) 1163-66.) Simon responded by confirming that "[d]efense is outside the limits and outside the SIR." (Id.)

On July 9, 2001, following the clear rejection of defense costs by the CGL Policy underwriters, Ragel faxed a quotation for umbrella coverage to Simon.[12] The first page of the quote provided:

> Underlying CGL is understood to provide coverage for indemnity payments only. This Umbrella policy will be also be [sic] endorsed to provide indemnity coverage only for any loss where the primary scheduled policy provides indemnity payments coverage only.

> (Kelly Affirmation, Ex. S (initial Umbrella Policy quote) at Zurich (M) 2134.)

Further, in setting out the extent of coverage provided by each level of underlying insurance, the quote specifically provided that such coverage would be for "indemnity pymts only." (Id. at 2135.)

The sample endorsements that Zurich included with its umbrella quote referred, however, to a provision inconsistent with Zurich's expressed intent, the Amended Defense and

---

[12] Silverstein argues that the Zurich umbrella policy was intended to follow the Zurich primary policy with respect to defense costs and that the umbrella underwriters separately never explicitly rejected inclusion of defense costs in the umbrella policy. (See Silverstein Entities' Reply to Br. of Zurich, dated July 22, 2005, at 6.) The argument does not help Silverstein, for defense costs also were not covered in the primary coverage.

Supplementary Payments endorsement. The standard clause, which was not printed out in Zurich's quote, contained the standard insurer's-right-to-control-the-defense clause. The term stated:

> We have the right and duty to assume control of the investigation, settlement or defense of any claim or suit against the insured for damages by this policy.

(Erlandson Decl. IV, Ex. 11 at Zurich (M) 2136.) The reference also found its way into Zurich's Binder for the umbrella coverage, issued on July 19, 2001. (See Kelly Affirmation, Ex. U.) Zurich also established reserves of $1.00 indemnity and $1.00 expense for each claim under the primary policy, and $500 indemnity and $250 expense for all claims made under the umbrella policy. (See Erlandson Decl. IV, Ex. 27 at Zurich 31143; Ex. 28 at Zurich 5012.)

Zurich issued its Binder through its affiliate, American Guarantee and Liability Insurance Company ("American Guarantee"), providing for $50 million in coverage, excess of the primary coverage, with a $100,000 SIR per occurrence, and a $150,000 deductible layer above the SIR. The Binder itself provided that its coverage was "for indemnity payments only" in support of a primary policy only if it too provided for "indemnity payments coverage only," exactly as Ragel had stipulated to Simon ten days earlier, on July 9, 2001.

On January 31, 2002, four months after the World Trade Center attacks, Zurich issued its full umbrella policy, consistent with and replacing its Binder. (See Kelly Affirmation, Ex. V at 2661.) The sample Amended Defense and Supplementary Payments endorsement, referred to by the Binder, was "deleted" by the Policy and "replaced." The replacement clause disclaimed any obligation "to assume charge of, or pay any cost of" investigation or defense.

> **SECTION III. DEFENSE AND SUPPLEMENTARY PAYMENTS**, is deleted in its entirety and replaced with the following:

> **SECTION III. DEFENSE**

**A.** We will not be required to assume charge of, or pay any cost of, the investigation of any claim or defense of any suit:

  1. Against any insured; or
  2. For which any insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

**B.** We will have the right, but not the duty to be associated with any insured or any underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for payment under this policy.

**C.** If all Underlying Limits of Insurance stated in Item 6. of the Declaration are exhausted solely by payment of damages, we shall have the right but not the duty to investigate and settle any claim or assume the defense of any suit which in our opinion may give rise to a payment under this policy. We may, however, withdraw from the defense of such suit and tender the continued defense to the insured at any time.

If we exercise our rights under Paragraphs **B.** or **C.** above, any such expense payments will reduce the Limits of Insurance provided by this policy.

(Id. at 2698.) Of course, the Binder issued before the occurrence of September 11, 2001 is the operative document, not the Policy issued after that occurrence.

*B. The Declaration Sought by the Parties*

Both Zurich's affiliate, American Guarantee, and the Silverstein Entities seek declarations as to their respective rights and obligations under the Umbrella Binder. Both move for summary judgment. I hold, for the same reasons that obtained with the Primary Policy, that the Umbrella Binder does not impose the duty to defend on the insurer, as was the plain intent of the parties, and I decline to alter the agreement of the parties to provide in some different way.

As with the Primary insurance, the "specific terms contained in the binder" are the most "reliable manifestation" of the parties' intent. See World Trade Ctr. Props., 345 F.3d at 169-70. Under the plain language of the Umbrella Binder, providing coverage for "indemnity payments only," following a Primary Policy providing also "indemnity payments coverage also," (Kelly Affirmation, Ex. U. at WILLIS-LIA 02080), the costs of investigation of claims and

defending lawsuits fell on the insured, and were not covered by insurance.  Coverage written to reflect the negotiations by sophisticated parties should not be re-written by the courts.

From the start of negotiations to procure primary and umbrella insurance coverage, the Zurich underwriters made clear that, in the absence of more reliable loss history data, any policies issued by Zurich would exclude defense obligations.  (See Kelly Affirmation Ex. C ("Maier Tr.") at 207:2-208:7, 214:5-18, 215:21-216:15; Ex. D ("Zervos Tr.") at 147:15-150:11, 209:6-10, 224:25-225:20; Ex. Q ("Ragel Tr.") at 131:3-132:11, 138:17-24; Ex. R ("Miller Tr.") 144:2-146:7, 148:17-149:14.)  Simon, Silverstein's broker at Willis, clearly was aware that the inadequacy of the available data would prevent him from securing coverage for defense costs.  (See Kelly Affirmation, Ex. B ("Simon Tr.") at 114:3-9, 116:25-117:21.)  That Silverstein continued to seek coverage for defense costs does not help his position, because it was clear that the Zurich underwriters refused to extend such coverage, and the Binder reflected Zurich's position, and not Silverstein's request.  A stubborn insistence on a position may be helpful in negotiating (although that too is doubtful), but stubbornness cannot change reality. Zurich did not change its position to accommodate Silverstein.  Throughout the negotiation process, the Zurich underwriters made clear that defense costs would not be covered because adequate loss history data did not exist.  Silverstein may have been disappointed with the final outcome of their negotiations, but disappointment is not a sufficient basis for altering the clear and unambiguous terms of a contract reached between two sophisticated parties.

I hold that the Umbrella Binder expressly excludes defense cost coverage and grant Zurich's (American Guarantee's) motion for summary judgment in this respect.

## V.  DUTY TO DEFEND UNDER EXCESS CARRIERS

### A.  The Excess Insurance Policies Generally

The Silverstein Entities were obligated under their lease agreement with the Port Authority to provide insurance coverage in amounts substantially greater than Zurich was willing to provide through its primary and umbrella policies. The insurance was provided in five layers of excess insurance, provided by thirteen insurers. Silverstein obtained the coverage through Professional Risk Brokers, working with Willis' affiliate brokerage firm, Stewart Smith, and with Craig Simon, the Willis broker on the primary and umbrella coverage programs provided by Zurich.

The thirteen excess insurers have each filed motions for summary judgment seeking declarations, respectively, that it has no duty to defend the Silverstein Entities. What follows is a brief summary of the terms and conditions of the various layers of excess insurance coverage, some in binder and some in policy form. The relative placement of the excess carriers is shown in the chart set out earlier in this Opinion.

1. The Second Layer of Coverage

*Lumbermens Mutual Casualty Company*

Following a period of negotiation, and in response to specifications submitted by the Silverstein Entities, Lumbermens Mutual Casualty Company ("LMC") issued a binder for excess coverage on July 19, 2001 in the amount of $25 million part of $50 million, excess of the $50 million Zurich Umbrella Policy, and with its scope of coverage to mirror that of Zurich's Umbrella Policy. Thus, the LMC Binder provided: "LEAD UMBRELLA-this binder is follow form to terms and conditions of the Zurich Quotation of 7/9/01 that was forwarded by your office." (LMC Ex. 5 at LMC/M 00056-57.) The LMC Binder also referenced the New York Amendatory Form Endorsement. The form provides:

> We will not be obligated to assume charge of the investigation, settlement or
> defense of any claims made, suits brought or proceedings instituted against the

insured relative to any "Insured Events" which appear reasonably likely to create liability on our part under the terms of this policy.

(Id. at LMC/M 00024.)  The LMC Policy, issued after September 11, 2001, was consistent with the Binder.

*Gulf Insurance Company*

Gulf Insurance Company ("Gulf") provided the second $25 million, part of the first excess layer of $50 million, co-equal in sequence to LMC.  Willis' preliminary request, sent on April 17, 2001, stated that the primary and umbrella policies issued by Zurich would include defense cost coverage in addition to the policy limits.  (See Zemann Decl., Ex. B)  Three months later, on July 18, 2001, Gulf issued its binder, superseded, on August 21, 2001, by its full policy. (See Zemann Decl., Ex. C, D.)  The Gulf Policy clearly disclaimed coverage of defense costs.  It provided that Gulf ("the Company") would have the right, but not the duty, to become involved in the settlement or defense of claims and that, if it were to exercise that right to become involved, it would be limited to its proportionate share of loss.  The Policy provided specifically:

> E.  Assistance and Cooperation.  The Company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the Insured; but the Company shall have the rights and opportunity to associate with the Insured in the defense and control of any claim or proceeding reasonably likely to involve the Company.  In such event the Insured and the Company shall cooperate fully.
>
> F.  Expenses.  Expenses incurred with the consent of the Company in the investigation or defense of claims … shall be borne by the Company in the proportion that the Company's share of loss bears to the total amount of such loss … Expenses thus paid by the Company shall be paid in addition to the Limits of Liability[.]

(Zemann Decl., Ex. D at G/M 0001-0020.)  The full policy, since it was in effect prior to September 11, 2001, was the operative document determining the rights and liabilities of the parties.

## 2. The Third Layer of Coverage

*General Star National Insurance Company*

General Star National Insurance Company ("General Star") provided the second layer of excess coverage: $25 million, excess of the $2 million primary, the $50 million umbrella, and the $50 million first excess layer. Howard Kupferberg of Stewart Smith first sought the excess layer from General Star above $75 million, but later revised that request on July 10, 2001, to seek the excess insurance for the layer above $100 million. Kupferberg confirmed to Simon, his colleague at Willis, that the placement with General Star would be for indemnity only, with defense costs not included. Eight days later, on July 18, 2001, General Star issued its Binder, effective the next day, July 19, and supplanted by its full Policy issued August 13, 2001. The Policy provided coverage of $25 million, in excess of the underlying insurance of $100 million, with defense costs excluded. The Policy provided that General Star "shall not be obligated to … defend any claim or suit against the insured. …" (See Gollub Decl. Ex. 14.)

## 3. The Fourth Layer of Coverage

*United States Fire Insurance Company*

United States Fire Insurance Company ("U.S. Fire") provided the fourth layer of insurance, above the $125 million provided by the primary, umbrella, and underlying excess layers. On April 19, 2001, Willis began negotiations with Crum & Forster, the affiliate of U.S. Fire. Based on the specifications provided by Silverstein, on July 17, 2001, Crum & Forster submitted a quotation and bound coverage for a $25 million policy to be issued by U.S. Fire, excess of $125 million above the CGL Policy. (See U.S. Fire, Corsi Decl., Ex. E, Crum & Forster's July 17, 2001 Quote and Confirmation of Binding.) Simon subsequently forwarded the U.S. Fire Binder confirming coverage on July 18, 2001. Crum & Forster's Binder, issued July

17, 2001, and providing $25 million of excess coverage, was made subject to several conditions, providing among them the condition that U.S. Fire "shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured[.]" (Corsi Decl., Ex. B at USF/M 00041.)

U.S. Fire's full policy, issued July 18, 2001, effective July 19, 2001, repeated the exclusion of defense costs, providing:

> Except as otherwise stated herein, and except with respect to (1) any obligation to investigate or defend any claim or suit. . .
> . . .
> E.  Assistance and Cooperation.  The company shall not be called upon to assume charge of the settlement or defense of any claim made or proceeding instituted against the insured; but the company shall have the right and opportunity to associate with the insured in the defense or control of any claim or proceeding reasonably likely to involve the company.  In such event the insured and the company shall cooperate fully.

U.S. Fire, on July 26, 2001, invited Willis to "review and verify the policy."  Neither Willis nor Silverstein made any further comment.

4.  The Fifth Layer of Coverage

*Great American Assurance Company*

Great American Assurance Company ("Great American Assurance"), as part of the fifth layer of insurance, provided $40 million of coverage as part of a $115 million layer, excess of underlying insurance of $150 million.  Professional Risk Brokers, acting as a second broker for Silverstein to secure such excess coverage, sought out Great American Assurance on June 20, 2001.  The full policy was issued on August 8, 2001.  The Great American Assurance Policy also excluded defense costs, giving it the right, but not the duty, to investigate claims and defend suits.  It provided in relevant part:

III.  Defense

A. We will not be required to assume charge of the investigation of any claim or defense of any suit against you.

B. We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss."  If we exercise such right, we will do so at our own expense, but not after the limits of this policy are exhausted.

(Zemann Decl., Ex. H at GA/M 00082.)

*Great American Insurance Company*

The Great American Insurance Company ("Great American Insurance") provided a second part of the fifth layer—$50 million of the $115 million layer, excess of $150 million. Great American Insurance issued its Binder on July 19, 2001, with the full Policy being issued on September 25, 2001, after the occurrence of September 11.  (See Zemann Decl., Ex. K, L.)

The Great American Insurance Binder did not contain a specific reference to defense obligations, providing only that the language in the full policy would control.  (See id., Ex. M at 183-184, 214-215.)  The standard policy form utilized by Great American Insurance in its full policy provided as follows:

III.  DEFENSE

A. We will not be required to assume charge of the investigation of any claim or defense of any suit against you.

B. We will have the right, but not the duty, to be associated with you or your underlying insurer or both in the investigation of any claim or defense of any suit which in our opinion may create liability on us for "loss" under this policy.  If we exercise such right, we will do so at our own expense.

C. If all Underlying Limits of Insurance … are exhausted solely by payment of "loss," we shall have the right but not the duty to investigate and settle any claim or assume the defense of any suit which in our opinion may give rise to a "loss" under this policy.  Such investigation or defense shall be at our own expense.  We may, however, withdraw from the defense of such suit and tender the continued defense to you if our applicable Limits of Insurance … are exhausted by payment of the "loss."

(Zemann Decl., Ex. L at GA/M 00004.)  The Policy, however, was issued after September 11, 2001.

*Athena Assurance Company*

In the spring of 2001, Howard Kupferberg of Stewart Smith submitted specifications to Athena Assurance Company ("Athena") to secure Athena's participation in the Silverstein Entities' excess insurance program, and requested coverage for "Defense Costs in Addition to Limit of Liability" and "First-dollar duty to defend if primary is exhausted and where no primary coverage exists."  (See Silverstein Entities Mem. Opp. to Athena Mot. for Summ. J. at 2.)  Athena issued a Binder on July 18, 2001, providing for coverage of $25 million, excess of $150 million.  The Athena Binder did not accept Kupferberg's request, but provided instead that it would follow "the Terms & Conditions of the immediate underlying excess policy[.]"  (Levine Aff., Ex. Q at ATH/M 0095.)  The immediately underlying Policy, that provided by U.S. Fire, excluded coverage for defense costs.

Athena issued its Policy on or about October 11, 2001.  It included its X2000 form that it typically used for coverage, a practice that should have been known to brokers.  The X2000 form expressly disclaimed any assumption of a defense obligation, providing that the insurer has "no duty to defend any 'protected person' against any claim or suit for damages" covered by the agreement.

5.  The Sixth Layer of Coverage

*St. Paul Indemnity Insurance Company*

In the Spring of 2001, Simon requested coverage from St. Paul Indemnity Insurance Company ("St. Paul"), and asked for "Defense Costs in Addition to Limit of Liability" and "First-dollar duty to defend if primary is exhausted and where no primary coverage exists."

St. Paul issued its Binder on July 18, 2001, providing for coverage of $25 million part of $200 million in excess of $265 million in underlying insurance. Like the Athena Binder, the St. Paul Binder did not accept Simon's request for defense cost coverage. The St. Paul Binder provided that its coverage would, "Follow form Excess per St. Paul Policy Form X2000." The X2000 form, thus incorporated by reference, excluded defense costs:

> We have no duty to defend any 'protected person' against any claim or suit for damages covered by this agreement. However, we have the right to associate in the defense and control of any claim or suit that is reasonably likely to involve the coverage of this agreement.

> St. Paul issued its full Policy on April 11, 2002. It included policy form X2000.

*Royal Insurance Company*

On July 17, 2001, Royal Insurance Company ("Royal") issued its Binder, covering $25 million part of $200 million, excess of $265 million, excess of the Primary Policy. The Royal Binder provided that its coverage was "[s]ubject to the terms and conditions of the lead umbrella and the underlying layering." (See Royal Statement of Material Facts, Ex. A at WILLIS 59343.) Stewart Smith, on July 25, 2001, confirmed that coverage on behalf of Silverstein.

The full Royal Policy was issued prior to September 11, on August 1, 2001. The Royal Policy, however, contained a duty to defend beyond any exhausted limits of the underlying policies. The Policy provided:

> We will have the right to participate in the defense of claims or suits against you seeking damages because of injury to which this insurance may apply. We will have a duty to defend such claims or suits when the applicable limit of insurance of the "Underlying Insurance" has been exhausted by payment of judgments, settlements and any cost or expense subject to such limit.

(See Royal Policy, dated August 1, 2001 at WILLIS 51002.)

*Ohio Casualty Insurance Company*

Howard Kupferberg of Stewart Smith sought the next layer of excess coverage from Ohio Casualty Insurance Company ("Ohio Casualty"). In July 2001, Kupferberg asked Ohio Casualty to issue its quote on the basis of the Zurich quote for the primary Umbrella coverage providing indemnity coverage only. In response, on July 18, 2001, Ohio Casualty issued its Binder (the "Ohio Casualty Binder"), followed on July 24, 2001 by its full Policy, with limits of liability of $50 million, part of $200 million, excess of $265 million. (See Nunberg Decl., Ex. F.)

The Policy excluded defense cost coverage. It provided that coverage was to follow "the 'first underlying insurance,'" (id., Ex. D at 0C0037), and, incorporating the terms of the "Excess Liability Coverage Form," expressly precluded assumption of any defense obligation. Thus, the Ohio Casualty Policy provided that Ohio Casualty would not "be required to assume charge of the investigation of any claim or defense of any suit" against the Silverstein Entities. (Id. at C0038.)

*Liberty Mutual Insurance Company*

Liberty Mutual Insurance Company ("Liberty") issued its Binder on July 18, 2001, covering liability of $50 million, part of $200 million, excess of $265 million, excess of Zurich's CGL Policy and following form to Zurich's Umbrella Policy. (See Liberty Statement of Material Facts, Ex. A.) The Liberty Binder incorporated by reference Form LIU-xs-02, providing that Liberty "will not be required to assume charge of the investigation of any claim or defense of any suit against [the insured]." (Id., Ex. D at LIB 5.) The full Policy issued after September 11, 2001 contained that Form.

*National Surety Corporation*

National Surety Corporation ("National Surety") issued its Binder on July 20, 2001, covering liability of $30 million, part of $200 million, excess of $265 million, excess of the Zurich Primary.  (See National Surety Statement of Material Facts, Ex. B.)  The full Policy followed on August 16, 2001, covering the period from July 1, 2001 through July 1, 2002.  (See National Surety Statement, Ex. A at WTC M 2880-2904.)  The insuring agreement of the National Surety Policy followed the form of the umbrella and provided also:

> II.  Defense and Expense of Claims and Suits.
>
> A.  We shall not be obligated to assume the charge of or participate in the settlement or defense of any claim made, or suit brought, or proceedings instituted against the Insured. …

(Id. at WTC M 2881.)

*AXA Corporate Solutions Insurance*

AXA Corporate Solutions Insurance ("AXA") issued its Binder on July 18, 2001 for the year following, to July 19, 2002, providing for liability of $20 million part of $200 million, excess of $265 million, excess of Zurich's Primary and Umbrella and incorporating AXA's policy form designated as "Excess Following Form Coverage."  (See AXA Statement of Material Facts, Ex. A.)  The full Policy was issued after September 11, and provided in the injuring agreement appended to the Policy that AXA "will have no duty to investigate any claim or defend any Suit against the Insured." (Id. at AXA 6)

*B.  Motions or Claims Ripe for Decision*

The Silverstein Entities having filed this lawsuit to declare their rights against their insurers with regard to the Port Authority's status as an Additional Insured, and with regard to their claims for reimbursement of defense costs, now seek to separate their claims against the

primary and umbrella carriers from their claims against the carriers who provided excess coverage. Notwithstanding that all the excess carriers joined in motions for summary judgment to dismiss Silverstein's claims for defense costs under the Zurich primary and umbrella policies and, by implication, all the excess policies following Zurich's coverages, and notwithstanding that discovery has been fully pursued by and against all carriers, Silverstein now argues that motions relating to the excess are premature. The argument is without merit and is denied.

Silverstein's first argument is that it made no claim against a number of the excess carriers—Gulf, Great American Insurance, Great American Assurance, Liberty, AXA, National Surety, Ohio Casualty, Royal, and LMC. However, Zurich asserted such claims, and I consolidated the proceedings, for the issues were identical. Silverstein had every opportunity to make all its arguments against all carriers, and no party has suggested that there are facts that were not pursued, or issues that were not argued, as respects any carrier. Silverstein next argues that the motions are premature against all thirteen of the excess carriers because the underlying policies have not been exhausted. The issues in these declaratory judgment actions are ripe, however, and an adjudication is important for the surrounding September 11 litigations, of which there are now more than 3,000 cases.[13] Finally, Silverstein argues that various of the motions are defective because they fail to specify the parties against whom relief is sought. All these arguments are without merit. The parties are known; the relief as to the duty to defend is clearly

---

[13] The September 11 cases consolidated before me, totaling over 3,000 in number, have been organized under separate master dockets. The cases among the insurance carriers inter se and with the insured and additional insureds are docketed as 03 Civ. 00332. Cases alleging personal injury and wrongful death resulting from the attacks of September 11 are consolidated under Master Docket 21 MC 97. Cases concerning property damage and business loss arising out of September 11 are consolidated under Master Docket 21 MC 101. There are also suits seeking relief for respiratory injuries sustained by cleanup, recovery and rescue crews who worked at the World Trade Center site and the surrounding areas in the weeks and months following September 11. Cases brought by workers who sustained respiratory injury while working at the World Trade Center site have been consolidated under Master Docket 21 MC 100. Cases brought by workers who sustained respiratory injury while working in the area surrounding the World Trade Center site have been consolidated under Master Docket 21 MC 102. And there are sundry other cases, with jurisdictional challenges that have not yet been organized for administrative convenience.

raised; and prompt adjudications are necessary for the progress of all the lawsuits. Indeed, the importance of the parties and issues of this lawsuit to all the other lawsuits was stressed by all the parties when these cases were filed and I expressed reluctance to consider the issues sufficiently similar to the issues in the other September 11 proceedings to justify transfer to me from the judge originally assigned to preside over them. The cases of the insurance carriers implicate the Port Authority and its lessees, as well as the limitation of liability to the Port Authority's insurance coverage provided by the Air Transportation Safety and System Stabilization Act. Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified at 49 U.S.C. §§ 40101 note). Accordingly, it is critical that all concerned understand the scope and limits of the Port Authority's obligations.

There is no time for further delay in this insurance litigation. These motions represent the second effort of Silverstein to gain coverage for defense costs that they were unable to gain in the context of contract negotiations. There is no sound reason to entertain still a third round of motions.

*C. The Duty to Defend*

Having established that the motions pending before me are ripe for review, I must now turn to an analysis of whether the excess insurers, either by binder or final policy, assumed a duty to defend. For the reasons stated below, I hold that the excess insurers, save one, did not assume any duty to defend.[14]

1. Excess Carriers With Final Policies

Seven of the thirteen excess insurers, Gulf, General Star, U.S. Fire, Great American Assurance, National Surety, Ohio, and Royal issued final policies prior to September

---

[14] As to all of the excess insurers, Silverstein again raises the argument that the rejection of any defense obligation contravenes New York public policy as set forth in Regulation 107. For the reasons already stated earlier in this Opinion and in September 11th Liability Insurance Coverage Cases, 333 F. Supp. 2d at 126, this argument is without merit.

11, 2001.  As to six of these seven, I find that their policies expressly disclaimed any duty to defend and therefore grant their motions for summary judgment as to the duty to defend.  As to the remaining excess insurance policy issued by Royal, I find that Royal did in fact purport to assume a limited defense obligation, and I therefore deny its motion and declare the insured's rights against it.

I am bound to enforce these final policies in accordance with the plain meaning of their terms.  See United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108-09 (2d Cir. 1993).  Here, the policies issued by six of the named insurers expressly disclaim any duty to defend.  The Gulf and U.S. Fire Policies both provide that the insurers "shall not be called upon to assume the charge of the settlement or defense of any claim made or proceeding against the Insured[.]"  The General Star Policy provides that General Star "shall not be obligated to … defend any claim or suit against the insured[.]"  The Great American Assurance Policy provides that Great American Assurance "will not be required to assume charge of the investigation of any claim or defense of any suit[.]"  The National Surety Policy provides that National Surety will not be obligated "to assume the charge of or participate in the settlement or defense of any claim made, or suit brought, or proceedings instituted against the Insured[.]"  The Ohio Casualty Policy provides that Ohio Casualty "will not be required to assume the charge of any investigation of any claim or defense of any suit."

Despite the clear rejection of defense costs in the above policies, the WTC Entities urge nevertheless that such disclaimers should be disregarded as in contravention of the intent of the parties.  (See Transcript of September 12, 2005 Hearing at 25:5-10.)  It is axiomatic that the clearest evidence of what the parties intended is the language of the agreement itself.  Thus, I "may not disregard clear provisions which the insurers inserted in [an insurance policy]

and the insured accepted." <u>Caporino v. Travelers Ins. Co.</u>, 476 N.Y.S.2d 519, 521 (1984). Here, the Policies were delivered to the Silverstein Entities via the primary brokers assigned to obtain excess insurance coverage on their behalf in the weeks preceding September 11, and accepted without objection. The terms of the Polices are binding.

In marked contrast, the Royal Policy expressly assumes a limited duty to defend, providing that Royal "will have a duty to defend … claims or suits [against the Insured] when the applicable limit of insurance of the 'Underlying Insurance' has been exhausted[.]" (<u>See</u> Royal Policy at WILLIS 51002.) Since the language of the Royal Policy clearly assumes a duty to defend, I hold that Royal assumed such a duty, even if it did so alone among all other insurers. Its assumption, however, is subject to a condition precedent, springing into effect when underlying limits have been exhausted. Accordingly, I deny Royal's motion for summary judgment.

<u>2. Excess Carriers With Binders Only</u>

The remaining excess insurers, LMC, Liberty, Great American Insurance, Athena, AXA, and St. Paul, did not issue policies in advance of September 11 and, as such, their Binders serve as the controlling instruments, supplemented as required by extrinsic evidence. Taking into consideration the terms incorporated by reference into the various excess Binders as well as the parties' intent, I hold that the excess insurers did not assume any duty to defend the Silverstein Entities and therefore grant their motions for summary judgment.

Certain of the above named excess insurers, LMC, Liberty, AXA, and St. Paul, issued binders containing express reference to policy forms disclaiming any duty to defend. Thus, the LMC Binder contained reference to the New York Amendatory Form Endorsement which provides that the insurer "will not be obligated to assume charge of the investigation,

settlement or defense of any claims made, suits brought or proceedings instituted against the insured[.]" (LMC Ex. 5 at LMC/M 00056-57.) Similarly, the Liberty Binder contained reference to the policy form designated as LIU-xs-02, which provides that Liberty "will not be required to assume charge of the investigation of any claim or defense of any suit against [the insured]." (Liberty Statement, Ex. A at LIB 5.) The AXA Binder, in addition to stating that it would follow form to the underlying Umbrella Policy, also expressly stated that the policy ultimately issued would consist of the policy form designated as "Excess Following Form Liability Coverage," which expressly provides that AXA "will have no duty to investigate any claim or defend any Suit against the Insured." (AXA Statement, Ex. A.) The St. Paul Binder also indicated that it was to follow form to the underlying Umbrella Policy and further disclaimed any duty to defend by reference to St. Paul Policy Form X2000 which provides that St. Paul "has no duty to defend any 'protected person' against any claim or suit for damages[.]" Thus, by incorporation, the LMC, Liberty, and St. Paul Binders all expressly disclaimed the assumption of any duty to defend.

Silverstein again makes the argument that the binders contravene the stated intent of the parties. This argument fails. Certainly, Silverstein may have sought defense cost coverage, but desire alone is insufficient to create a contractual obligation. Here, LMC, Liberty, AXA, and St. Paul all determined against providing for defense costs, and delivered Binders to Silverstein's broker that excluded such obligation. The terms of the Binders are clear, and they control any subjective intent to the contrary.

The remaining excess binders, issued by Athena and Great American Insurance, do not make express reference to forms disclaiming any assumption of a duty to defend. Nevertheless, a consideration of the terms of these binders, together with a consideration of the

terms usually included in policies issued by these carriers, demonstrates that neither assumed a duty to defend.

The Athena Binder, like the St. Paul Binder, expressly provides that it is to follow the terms and conditions of the "immediate underlying excess policy." (Athena Statement at ¶ 43.)  As previously noted, neither U.S. Fire, nor any of the other excess insurers sitting beneath Athena, namely General Star, Gulf, and LMC, agreed to provide defense cost coverage to the Silverstein Entities.  Moreover, at the time of binding, the X2000 Form, referenced explicitly in the St. Paul Binder, was the excess coverage form typically used by Athena's underwriter, and there is no allegation that Silverstein's excess brokers were not so aware.  The Silverstein Entities again urge that such incorporation of the X2000 is improper insofar as it contravenes their intent to obtain defense cost coverage.  I do not accept this argument for the same reasons as with the other carriers, namely, the primacy of the written agreement and the objective intent of the parties.  To impose upon Athena an obligation that no other underlying insurer was willing to assume, particularly in light of Athena's expressed intent to follow form to the underlying insurance and its incorporation of its X2000 form by reference, would work a manifest injustice.

The analysis applied to interpretation of the Athena Binder applies with equal force to the binder issued by Great American Insurance.  The Great American Insurance Binder, like the Athena Binder, made no express reference to defense obligations.  At the time of binding, however, Great American Insurance incorporated its standard form by reference, thus providing that Great American Insurance would not "be required to assume charge of the investigation of any claim or defense of any suit[.]"  (Great American Insurance, Ex. L at GA/M 00004.)

Thus, it is clear that the excess insurers were unwilling to provide for defense cost coverage. Silverstein is not entitled to a windfall, rewriting to his advantage that which the insurers were unwilling to provide in the binders they issued.

## VI. CONCLUSION

Thus, in accordance with the foregoing, the motions for summary judgment of the various insurers seeking a declaration that they have no obligation to provide defense costs to their insureds, the Silverstein Entities, are granted, save for the motion of Royal. The motion of Royal is denied, and its rights are declared as provided in the section describing its status. A status conference will be held on June 26, 2006 at 2:00 P.M. to address the remaining issues in this litigation and to set a schedule for further proceedings. In advance of the conference, the parties are to submit a joint statement of the issues that remain for consideration. Such joint submission should be received by June 21, 2006.

SO ORDERED.

Dated:     New York, New York
          June ___, 2006

ALVIN K. HELLERSTEIN
United States District Judge

41