UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE SEPTEMBER 11TH LIABILITY INSURANCE COVERAGE CASES

03 CV 0332 (AKH)

*DOCUMENT FILED ELECTRONICALLY*

**ZURICH'S MEMORANDUM IN OPPOSITION TO THE PORT AUTHORITY AND PATH'S MOTION FOR SANCTIONS**

Kevin T. Coughlin (KC 8550)
Robert J. Kelly (RK 4955)
COUGHLIN DUFFY LLP
88 Pine Street
New York, NY 10005
(212) 483-0105

*Attorneys for Zurich American Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company*

Thomas W. Kirby
- (Pro Hac application pending)
John E. Barry (Pro Hac Vice)
Thomas W. Brunner
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000

# TABLE OF CONTENTS


Page

I. PRELIMINARY STATEMENT ..... 1

II. THE PORT AUTHORITY WOULD HAVE TO MEET VERY STRINGENT LEGAL STANDARDS TO OBTAIN SANCTIONS HERE ..... 4

III. ZURICH'S POSITIONS CONCERNING THE PORT AUTHORITY WERE MANIFESTLY REASONABLE AND RESULTED FROM DILIGENT INVESTIGATION ..... 5

A. The Facts Known to Zurich Prior to Litigation Clearly Supported Zurich's Refusal to Yield to the Port Authority's Categorical Demands for Unlimited Coverage ..... 6

1. The Structure of the WTC Lease Transaction Was Not Fully Explained to Zurich Prior to Binding Coverage ..... 6

2. Zurich Issued Policies Consistent with the Instructions Received from Willis ..... 9

B. After September 11th, Critical Gaps in the Information Provided to Zurich Were Revealed ..... 10

C. From the Outset, Zurich Acknowledged the Possibility of Coverage for the Port Authority While Continuing to Seek a Negotiated Resolution ..... 11

D. The Port Authority Persisted in its Unfounded Assertion to Plenary Coverage ..... 13

E. The Court Insists on Precision in Denying the Port Authority's Rule 12(c) Motion ..... 16

F. Discovery Supported Zurich's Contentions with Respect to the Port Authority's Claims ..... 20

G. Zurich Acted Seasonably to Amend its Pleadings Once Warranted by Discovery ..... 22

H. In Light of the Facts, the Port Authority is Clearly Not Entitled to Sanctions Under Rule 11 Against Zurich or its Counsel ..... 24

1. Rule 11 Sanctions are Unwarranted Because the Pre-Binding Underwriting Record Supported Zurich's Positions ..... 24

2. The Port Authority's Categorical Position Failed to Acknowledge the "Material Omissions and Discrepancies." ..... 25

IV. THERE IS NO BASIS FOR IMPOSITION OF RULE 37 SANCTIONS ..... 29

A. Zurich's Document Production Efforts Were Reasonable ..... 29

1. Zurich Acted Reasonably in Defining the Scope of its Document Search ..... 29

**TABLE OF CONTENTS**
(continued)

**Page**


2. After Being Alerted to the 9/11 Document, Zurich Promptly Produced It ........ 30

3. Subsequent Discovery Ordered by the Court Was Limited in Scope ........ 33

B. Considered in the Context of the Litigation as a Whole, Zurich's Discovery Activities Were Reasonable and Do Not Warrant Sanctions ........ 35

V. THE PORT AUTHORITY'S FEE/COST APPLICATION IS PATENTLY UNREASONABLE ........ 38

A. Legal Standards ........ 38

B. The Port Authority Should Not Recover for Time Spent by In-House Counsel ........ 39

C. Requests for Fees by the Port Authority's Outside Counsel Suffer from Myriad Defects ........ 40

VI. CONCLUSION ........ 42

## TABLE OF AUTHORITIES

### FEDERAL CASES

Abrahamson v. Board of Education,
374 F.3d 66 (2d Cir. 2004) .......... 39

Bristol Investment Fund v. Carnegie International Corp.,
302 F. Supp. 2d 177 (S.D.N.Y. 2003) .......... 38

Kirschner v. Zoning Board of Appeals,
159 F.R.D. 391 (E.D.N.Y. 1995) .......... 40

Kurz v. Chase Manhattan Bank USA, NA,
324 F. Supp. 2d 444 (S.D.N.Y. 2004) .......... 39

Marisol A. v. Giuliani,
111 F. Supp. 2d 381 .......... 39

Matthew Bender & Co. v. West Publishing Co.,
240 F.3d 116 (2d Cir. 2001) .......... 39

Sea Spray Holdings,
277 F. Supp. 2d at 324 .......... 39

Vernon,
220 F. Supp. 2d at 229 .......... 39

World Trade Center Properties, L.L.C. v. Hartford Fire Insurance Co.,
345 F.3d 154 (2d Cir. 2003) .......... 16, 17, 19, 25, 37

### FEDERAL STATUTES

28 U.S.C. 1927 .......... 5

## I. PRELIMINARY STATEMENT

> The Court: "We need precision and that's what's lacking here"
> (Transcript of December 23, 2003, p. 20:14; Affirmation of Joan Lewis (hereinafter Lewis Aff.) Ex. 22.
>
> "The material omissions and discrepancies are difficult to understand where the financial stakes were so large and the parties so sophisticated."
> (Opinion and Order Denying R.12 Motions, p. 17 Lewis Aff. Exhibit 52)

The World Trade Center lease transaction was the largest in history --a 99 year lease involving placement of one billion dollars in liability insurance coverage. Thousands of pages of leases, operating and management agreements, and related documents were negotiated among dozens of interested parties including the Port Authority, the Silverstein interests, Westfield, and the lenders, over a period of three months. The transactions were set forth in precise detail in the leases and other closing documents, after intense scrutiny by expert counsel and sophisticated parties.

Inexplicably, in the midst of these thousands of hours of preparation, Zurich[1] was not told of the structure of the transaction nor provided copies of any of the lease or other documents. To the contrary, Zurich was instructed to name as Named Insured an entity that was not a party to the lease agreements with the Port Authority. As a result the Zurich binders did not correctly reflect the lessees that actually had the relationship with the Port Authority.

The Port Authority contended that since the Port Authority was the lessor to *someone*, and because the Zurich binder referenced a Managers or Lessors Endorsement, the Port Authority was clearly entitled to Additional Insured status, even though the Named Insured as directed by Willis was not the lessee, because *some* WTCP entity would ultimately be the lessee.

---

[1] Throughout this brief, "Zurich" shall refer to Zurich American Insurance Company, American Guarantee & Liability Insurance Company, and Steadfast Insurance Company.

This contention did not give any weight to the "precision" referenced by the Court. While it clearly appears in post 9/11 hindsight that Zurich had not been advised properly regarding the corporate transaction, the issue could not be resolved by ignoring the Binder.

This lack of precision is clear from the first line of the Statement of Facts in the Port Authority's brief where it asserts that "in July 2001, Silverstein Properties, Inc. ("Silverstein") entered into various lease transactions with the Port Authority for the World Trade Center." (Memorandum of Law in Support of the Port Authority's and PATH Corporation's Motion For Sanctions p. 6.) This is incorrect. Silverstein Properties, Inc. did not enter any lease transactions with the Port Authority, it was the Net Lessees of World Trade Center Properties LLC that did. The Port Authority clearly does not think such "details" matter, but they do.

Because the Binder stood as the operative document and, as drafted per the instructions of Willis, did not name as Named Insured the actual lessees of the Port Authority, under governing Second Circuit precedent and this Court's rulings, discovery was required into the pre-binder discussions and negotiations to discern the parties intentions with respect to the Port Authority. The issue was whether evidence of the pre-binder negotiations supported claims for coverage for the Port Authority, and if so, of what scope.

Zurich's initial Complaint made clear its understanding, based upon information provided to Zurich after 9/11, that coverage might well have been afforded additional WTCP entities had Zurich been adequately apprised of the structure of the transaction pre-binder and that modification of the policies might be necessary to reflect that fact. The Complaint further alleged that the Port Authority as lessor might be entitled to additional insured coverage, if the policies were modified to reflect additional WTCP entities as insureds.

Moreover, the issue of coverage has two inextricably intertwined elements—who is covered for what risk. Zurich's efforts to resolve the insurance status issue with the Port Authority yielded, at every turn, an unequivocal demand by the Port Authority for full coverage by Zurich, without reservation, of all defense and indemnity incurred by the Port Authority in connection with the WTC tragedy. This drastic position is reflected in the Port Authority's response to Zurich's mediation suggestion, its Answer to Zurich's Complaint including a bad faith claim; its Rule 12 motion seeking a declaration on status and scope; its numerous submissions to the Court seeking sanctions; and its summary judgment briefing. The Port Authority could have taken steps prior to binding to ensure that the binder would clearly reflect that the Port Authority was entitled to Additional Insured status and that the binder correctly reflected the entities with whom the Port Authority had a lessor relationship. Having failed to do so, the Port Authority cannot complain of Zurich's effort to resolve through discovery the insured status problems that were caused by others.

Unraveling the insured status issues in this case required substantial time and effort because of the "material omissions and discrepancies" in the underwriting process with respect to insured status issues resulting from failure to provide Zurich with critical information concerning the transactions prior to binder. These omissions were not of Zurich's creation; Zurich should not be penalized for seeking "precision" in resolving the insured status claim of the Port Authority. The Port Authority's strident inflexibility made attaining that precision vastly more difficult and protracted.

Importantly, the Court's denial of the Port Authority's Rule 12(c) motion eliminates any claim that the binders themselves made Zurich's position baseless. Thus, the Port Authority's

Rule 11 claim requires it to show that the products of discovery completely eliminated any basis for Zurich's position. No such showing is made.

The Port Authority accuses Zurich and its counsel of intentionally withholding from document production the 9/11 document printed out by Mary Merkel on the morning of September 11th. The declarations submitted with Zurich's opposition clearly set forth the circumstances explaining why the document was not produced earlier and why it was produced in February 2005 and rebut any contention that Zurich or its counsel intentionally withheld any relevant information. Simply stated, Zurich's counsel reasonable concluded that the place to find responsive materials was in the files of those responsible for the underwriting of the policies, they explicitly objected to any broader search, and that position was not challenged. Ms. Merkel was not such a person. Just because the 9/11 document was in Ms. Merkel's file does not mean that Zurich's document search was inappropriate.

The Port Authority's aggressiveness throughout this litigation carries over to this motion---in particular its fee request. Disregarding the Court's directive, neither the Port Authority in-house counsel nor its outside counsel has adequately segregated relevant fees and expenses from those incurred on unrelated issues. In-house counsel has claimed all time expended on all issues. The Dickstein firm has redacted a limited number of entries, but left hundreds of time entries that reference time spent on other issues. This disregard of the Court's directive, standing alone, warrants denial of the sanctions motion.

## II. THE PORT AUTHORITY WOULD HAVE TO MEET VERY STRINGENT LEGAL STANDARDS TO OBTAIN SANCTIONS HERE.

The Port Authority's motion for sanctions is governed by the same legal standards set out in Zurich's Memorandum in Opposition to the Westfield Parties' Motion for Sanctions. In the

interest of brevity and judicial economy, that discussion is incorporated by reference here. In a nutshell:

- The Port Authority relies heavily on Rule 11. To satisfy Rule 11's stringent objective standard, the Port Authority would have to show both that Zurich's positions were so "utterly lacking in support" as to constitute "direct falsehoods," and that Zurich's counsel either knew this or would have known it if they had conducted an investigation reasonable under the circumstances.

- But the Port Authority cannot rely on Rule 11's standard because it failed to follow the mandatory procedures of Rule 11(c)(1)(a). It did not serve a Rule 11 motion 21 days before filing, nor did it ever file a separate Rule 11 motion. Thus, it would have to justify sanctions under 28 U.S.C. 1927 and the Court's inherent authority, both of which require clear proof that Zurich pursued objectively baseless claims for improper purposes with subjective bad faith, a standard that is exceedingly hard to satisfy.

- To obtain Rule 37 sanctions, the Port Authority would have to show that Zurich failed to obey a discovery order or that, after learning of information it should have produced earlier, Zurich failed to seasonably update a discovery response. Moreover, such conduct must lack any substantial justification, including an absence of reasonable efforts to comply. And any fees awarded must be just and actually caused by a violation.

- To obtain sanctions based on spoliation, the Port Authority would have to prove that (1) Zurich had a duty to preserve evidence in its control at the time it was lost, (2) Zurich acted with a culpable state of mind, and (3) the evidence was relevant.

- Finally, the Port Authority would have to show that the amounts claimed were caused by the violation and are otherwise reasonable, taking into account all the circumstances of the case.

As Zurich shows below, no claim for sanctions has been or can be sustained, and the amounts claimed by the Port Authority are entirely unjustified. The time for arguing the merits is past. They have been settled. To obtain sanctions, the Port Authority must meet very demanding legal standards, which control how the facts are assessed and uncertainties resolved.

## III. ZURICH'S POSITIONS CONCERNING THE PORT AUTHORITY WERE MANIFESTLY REASONABLE AND RESULTED FROM DILIGENT INVESTIGATION.

The Rule 11 inquiry entails two fundamental questions: (1) are the positions advanced totally unsupported; and (2) did counsel present such positions after a reasonable investigation

would have shown that they were utterly baseless. Here, the answer to both questions is clearly no. The binders on their face gave reason to question the Port Authority's status, Zurich conducted reasonable investigation, and nothing that emerged eliminated any basis for Zurich's position.

A. **The Facts Known to Zurich Prior to Litigation Clearly Supported Zurich's Refusal to Yield to the Port Authority's Categorical Demands for Unlimited Coverage.**

1. **The Structure of the WTC Lease Transaction Was Not Fully Explained to Zurich Prior to Binding Coverage.**

The World Trade Center is owned by the Port Authority. In April 2001 the Port Authority begin negotiating with Silverstein Properties, Inc. for long term leases for portions of the World Trade Center. In anticipation of the completion of the World Trade Center lease transaction, in April 2001 representatives of Silverstein Properties, Inc. solicited quotations for primary commercial general liability and umbrella coverage. Silverstein delegated the responsibility for securing the insurance to its broker, Willis.

Craig Simon of Willis on April 17, 2001 sent to Dennis Zervos, an underwriting manager for Zurich, a preliminary submission of insurance specifications for the World Trade Center Properties. (First Declaration of Robert J. Kelly Ex. 8 (hereinafter Kelly Dec. Ex.) That submission included a section entitled "named insured" that identified the named insured as "Silverstein Properties, Inc. (World Trade Center)." (See id at Willis-LIA02999.)

On June 8, 2001 Mr. Simon provided the formal broker submission to Zurich for the World Trade Center liability insurance. This submission provided detailed information on the insurance program specifications for the general liability-excess liability for the Silverstein Properties Inc., (World Trade Center) Properties. (Lewis Aff. Exhibit 4) Similar to the preliminary submission, it identified the named insured as Silverstein Properties Inc., (World

Trade Center). (See id at 00294) The portion of the specifications that set forth the coverage sought for the umbrella coverage had the identical definition of the named insured. (See id at 00298). The submissions did not include copies of the lease, operating, management or loan agreements, or contractual insurance procurement provisions related to the World Trade Center lease transactions.

These documents were neither provided to Zurich during the negotiation of the policies nor were their terms described. (Maier p. 928:5-15; Kelly Dec. Ex. 10; Ragel Dp. 77:6-10; Kelly Dec. Ex. 10) On or about July 16, 2001, the Port Authority entered into five separate lease transactions for portions of the World Trade Center for a ninety-nine year term running through the year 2100. The five lease transactions (the "net leases") were with five entities, 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, 5 World Trade Center LLC, (the "net lessees") and Westfield WTC LLC, for respectively 1 World Trade Center, 2 World Trade Center, 4 World Trade Center, 5 World Trade Center, and the World Trade Center retail mall. These lease transaction documents were not provided to Zurich prior to issuance of the Zurich binders. Id.

The lease transactions involving the World Trade Center were the largest in history, and were negotiated over the relatively short three month period from April through July. Perhaps as a result of the speed at which the underlying transaction was moving, Zurich was not advised of developments with respect to the lease negotiations, nor was Zurich provided with any of the documents relating to the underlying lease transactions prior to issuance of the binders.

On July 18, 2001, Zurich sent a primary commercial liability binder to Willis. Consistent with the April 2001 solicitation, it identified the named insured as "Silverstein Properties, Inc./World Trade Center." (Lewis Aff. Exhibit 6) The binder did not name the Port Authority as

an Additional Insured. It did specify and identify coverage endorsements, including "Additional Insured Where Required Under Contract or Agreement" and "Additional Insured-Managers or Lessors of Premises" and provided that "Zurich wording would be used for all manuscript endorsements."

On July 24, 2001, Willis sent a fax to the Zurich primary commercial general liability underwriter requesting that "if the policy has not yet been typed, please amend the Named Insured & Mailing Address as follows: WORLD TRADE CENTER PROPERTIES LLC c/o Silverstein Properties, Inc." (Exhibit A to Statement of Zurich, et als In Response to January 7, 2004 Submission of World Trade Center Properties, LLC; Lewis Aff. Exhibit 24) Zurich's umbrella underwriter also received a request from Willis on July 24th to name World Trade Center Properties LLC as the insured for the umbrella policy.

On or about July 24, 2001, the Net Lessees and the Port Authority executed a First Amended and Restated Reciprocal Easement and Operating Agreement ("REOA"), which created a Net Lessees' Association ("NLA") comprised of the Net Lessees for 1, 2, 4 and 5 World Trade Center to implement various requirements contained in each of the leases. The REOA charges the NLA with procuring on behalf of the NLA and the Net Lessees' specified general liability insurance, including a contractual liability endorsement covering the NLA's and Net Lessees' indemnity obligations under the leases and the REOA, as well as additional insured coverage for various entities. These documents were also not provided to Zurich.

On July 27, 2001 Silverstein's Mr. Strachan apparently perceived a problem, providing to a colleague a list of entities that he wished to insure in addition to World Trade Center Properties LLC including the Port Authority, the Net Lessees that actually leased the various World Trade Center buildings, three Westfield companies and the Silverstein and Westfield lenders, stating:

"until we can get some time to meet with the PA on this issue, go with the following." (Exhibit B to Statement of Zurich, et als.; Lewis Aff. Exhibit 24.) This information was not provided to Zurich until many months after September 11th.

### 2. Zurich Issued Policies Consistent with the Instructions Received from Willis.

After the binder was issued it was the responsibility of the primary underwriter Ms. Maier, with the assistance of underwriting assistant Gladys Fonseca Matos, to assemble the primary policy based upon the terms of the binder. (Matos Tr. 44:2-13; Kelly Exhibit 11) Matos did nothing prior to September 11th to prepare the policy (Id. at 47:5-14)

On November 16, 2001, Zurich issued its primary policy number GLO2984207-00. As instructed by Willis, the policy lists "World Trade Center Properties LLC" as the Named Insured. Ms. Matos assisted Ms. Maier in the preparation of the primary policy as issued working from information in the binder. (Id. at 122:13-124:8). On January 31, 2002, Zurich issued its umbrella policy number AUC9300625-00 to named insured World Trade Center Properties LLC.

Consistent with the terms of the binder, the primary policy contained an "Additional Insured Managers or Lessors of Premises Endorsement." That endorsement provided, in pertinent part:

Schedule

1. Designation of Premises (part Leased to You)

(a) As per Company Records
(b) The insurer shall not, without obtaining express advance permission from the General Counsel of the Port Authority, raise any defense involving in any way the jurisdiction of the tribunal over the person of the Port Authority, the immunity of Port Authority, is commissioners, officers, agents or employees, the governmental nature Authority, and the protection afforded the net Lessee' Association there under with respect to any claims or action against the Net Lessees' Association by a third person shall pertain and apply with like effect with respect to any claim or

action against the Net Lessees' Association by the Port Authority and by the Net Lessees' Association against the Port Authority, but such endorsement shall not limit, vary, change, or affect either the protections afforded the Port Authority as an additional insured, or the protections afforded the Port Authority under the contractual liability endorsement.

2. Name of Person or Organization (Additional Insured)

If Any

3. Additional Premium: INCL

(if no entry appears, above, the information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement).

WHO IS AN INSURED (Section II) is amended to include as an insured the person or organization shown in the Schedule but only with respect to liability arising out of the ownership, maintenance or use of that part of the premises leased to you and shown in the Schedule and subject to the following additional exclusions: (Exhibit 3 to April 11, 2005 Letter from Mark Elias to Michael Levy; Lewis Aff. Ex. 46)

**B. After September 11th, Critical Gaps in the Information Provided to Zurich Were Revealed.**

In late 2001 Zurich began to receive claim notices concerning claims filed against the Port Authority and certain WTCP entities. In response, Zurich wrote to the WTCP entities and to the Port Authority requesting further information about the basis for the claims, reserving Zurich's rights under the policies, and explaining that Zurich required additional information to determine whether the WTCP entities and the Port Authority qualified as insureds under the policies. (January 16, 2002 letter from Michael Toussaint to Robert Strachan and Stephen Kerns (Lewis Aff. Ex. 16) On or about January 16, 2002, representatives of the WTCP entities asserted by letter that the primary and umbrella Zurich policies should be "corrected" and "amended" to add numerous additional entities. (Kelly Dec. Ex. 9) This letter confirmed that the documents as written did not cover those entities.

The WTCP entities named in the claims and suits were not the Named Insured on the policy, nor was the Port Authority named as an Additional Insured on the policy. From the

information supplied by the WTCP entities, it was apparent that critical information concerning the lease transactions had not been provided to Zurich prior to issuance of the binder, in particular the identity of the entities that would be leasing the property from the Port Authority. It was also apparent that World Trade Center Properties, LLC, the entity that Zurich had been instructed to name Named Insured, had no lessee relationship with the Port Authority. The structure of the transaction disclosed to Zurich after 9/11 did not "match up" with the binder that had been prepared per Willis' instructions. Zurich sought a method to resolve these issues without resort to litigation.

On January 7, 2002, inside counsel for Zurich as well as outside counsel Tom Brunner and Kevin Coughlin met in New York with the underwriters involved in the primary World Trade Center liability program Mark Elias, Lynn Maier and Dennis Zervos, and separately with the excess program underwriters Doreen Miller and Keith Ragel. In each January 7th meeting, counsel emphasized that all communications relating to this situation should be preserved, including communications that would be discarded in the ordinary course of business. *See* Declaration of Thomas W. Brunner (Mar. 15, 2007) ¶ 5 ("Brunner Decl.").[2]

### C. <u>From the Outset, Zurich Acknowledged the Possibility of Coverage for the Port Authority While Continuing to Seek a Negotiated Resolution.</u>

On January 14, 2003, World Trade Center Properties LLC filed Third-Party Complaints in three pending bodily injury claims before Judge Hellerstein, naming Zurich as a third-party defendant and seeking declaratory relief (1) that the terms of the insurance policies obligated Zurich to assume the defense of WTC Properties LLC and (2) that various related and third-party

[2] Given the nature of this case, senior in-house Zurich counsel remained closely involved throughout, providing ongoing supervision to Zurich's team of outside counsel. Zurich considered and established its litigation positions based on the facts as they developed and the privileged advice of its counsel. Following management changes within the company, Zurich gradually changed how it used the services of Wiley Rein, leading the firm to withdraw from several Zurich matters, including this one. It is inaccurate and unfair for the sanctions motions to suggest, by sly juxtaposition of facts, that this withdrawal resulted from the allegations contained in the sanctions motion.

entities are included as insureds, whether as insureds or additional insureds, under the insurance policies.

The following day, January 15, 2003, Zurich filed its Complaint for Declaratory Judgment, naming various WTCP entities, the Westfield entities, the Port Authority and PATH, lenders involved in the transaction, and other insurers. Zurich filed contemporaneously with its Complaint a Motion for mediation pursuant to Local Civil Rule 83.12. By its Complaint, Zurich sought a declaration that it owed no defense obligations under the policies in question.

Zurich further sought guidance from the Court regarding the insured status claims that had been made by WTCP entities and the Port Authority. With regard to the former, the Zurich Amended Complaint acknowledged that:

> Notwithstanding the clear terms of the policies and course of dealing between ZAIC and the WTC entities prior to July 19, 2001, based upon the ownership structure created to complete the World Trade Center lease transaction disclosed to ZAIC since September 11, 2001, it now appears possible that entities other than or in addition to named insured World Trade Center Properties LLC would have been included as named insureds under the policies had they been properly disclosed to ZAIC. These entities may include 1 World Trade Center LLC, 2 World Trade Center LLC, 4 World Trade Center LLC, and 5 World Trade Center LLC, for example. Discovery will be required to ascertain whether any modification of the policies in this regard is proper. (Amended Complaint; Lewis Aff. Ex. 17, ¶13)

With respect to the Port Authority's insured status claim, the Zurich Complaint stated:

> As the owner and lessor of the World Trade Center premises, the Port Authority may be afforded some coverage under the policies (if the policies are modified as suggested in paragraph 13), but such coverage would be confined to (at most) the Port's vicarious liability for the alleged acts or omissions of the named insured. (Amended Complaint, Id. at ¶14).

In its Motion for Mediation, Zurich noted that it had proposed a mediation among all interested parties and had agreed with some of those parties to employ a nationally prominent mediator for that purpose. However, Zurich had been unsuccessful in obtaining the agreement of

all of the asserted insureds to participate in mediated negotiations. Noting the "important public interest" in at least attempting mediation, Zurich requested that the Court order all parties to mediation pursuant to its power under the Local Rules.

Zurich's claims in its Complaint for Declaratory Judgment were supported by the terms of the Zurich Binders and Policies which, in accordance with Willis' instructions, named as the sole Named Insured World Trade Center Properties LLC and which did not name the Port Authority as an additional insured. While it was apparent that Willis had erred in failing to accurately communicate to Zurich the appropriate list of insureds, giving rise to the request that the Zurich policies be "corrected" and "amended" to add numerous additional entities, Zurich faced significant risk should it afford coverage to entities ultimately deemed not insureds under the policies. Having failed in its efforts to organize a mediation outside the litigation context to resolve these issues, Zurich included in its Complaint a claim for declaratory relief seeking the Court's guidance on insured status.

**D. The Port Authority Persisted in its Unfounded Assertion of Plenary Coverage.**

Zurich's Complaint resulted in an unusually aggressive response by the Port Authority. The Port Authority asserted a counterclaim in its Answer alleging that Zurich "by its conduct, including its refusal to defend and indemnify the Port Authority without a reservation of rights, as the Port Authority requested, and its commencement of this action, has breached the duty of good faith and fair dealing that it owed to the Port Authority." (Kelly Dec. Ex. 3 p. 37) The broad bad faith allegations of the Port Authority claimed that Zurich acted in bad faith with respect to all of the coverage issues existing between Zurich and the Port Authority, and including the claim that the Zurich policies afforded defense cost coverage.

The mediation proposed by Zurich proceeded but was unsuccessful. The Court thereafter directed that the parties set forth Statements of Contentions.

The Port Authority contended that it was entitled to additional insured coverage under the Zurich policies either through the "Additional Insured-Managers or Lessors of Premises" endorsement or through contractual liability coverage in the Zurich primary policy pursuant to the net leases, the REOA, and the liability coverage procured by the lessee entities. (Port Authority and PATH Contentions, Kelly Dec. Ex. 1 pp 13-21) The Port Authority contended that the additional insured coverage under the Managers or Lessors of Premises endorsement is "extremely broad" and covers "all claims asserted against the Port Authority arising out of or resulting from the attacks of September 11, 2001…." (Id. p. 23) The Port Authority also claimed that under the "contractual liability" coverage, "the Silverstein/WTC entities are required to provide full indemnification for any and all loss at the World Trade Center site based upon the aforementioned requirements contained in the net leases and the REOA."

Zurich asserted the following contentions with respect to the Port Authority's coverage claims.

> Zurich complied with the instructions it received from the WTC Entities' broker. The only Named Insured is World Trade Center Properties LLC.
>
> (a) Willis instructed Zurich to issue the primary and umbrella policies to Named Insured World Trade Center Properties LLC. Zurich issued the policies in conformance with those instructions.
>
> (b) At no time during the negotiations of the Zurich policies did Willis or any one else disclose the complex structure of entities being created to complete the WTC lease transaction, nor did Zurich ever receive any request to add these entities, the Port Authority, Westfield, or the lenders as named or additional insureds. Had the corporate structure been disclosed to Zurich at the time, it is possible that some of the asserted insureds would have been covered for limited purposes, but because the information was not disclosed contemporaneously, Zurich is uncertain as to which entities might have qualified. (Lewis Aff. Ex. 20 p. 18-19)

Following the filing of the respective parties' contentions the Port continued to maintain its all encompassing position with respect to its coverage claims. At the July 7, 2003 Status Conference, Mr. Burke stated as follows:

> We view the London coverage as excess. I think it's clear from the policies, I just wanted to make sure that I wasn't silent in view of that discussion. We think they are excess, we think the Zurich policy it clearly names as an additional insured. We don't think there is any issue about status, any issue about scope, I don't think there is any issue that our policy comes in as excess to Zurich. Having said that, we're still interested in discussing what Your Honor mentioned before, which was the mediation. (Kelly Dec. Ex. 4; p. 6:16-25)

At the October 9, 2003 Status Conference there was discussion of what had been apparent from the outset:

> Mr. Brunner: "There was a terrible mistake made, it appears, with regard to who are the insured entities under these policies." (Kelly Dec. Ex. 5 p. 19:13-16)
>
> Court: "There is a great deal of confusion about that issue as well." (Id. at 19:17-18)
>
> Court: "Just to take this point, if the Port Authority is being sued for the design of the towers as a ground of duty and negligence, that's one consideration; but if the ground, the ground of action is the instructions given in terms of how to evacuate the towers, a whole different set of issues could be implicated; and we don't know what is going to happen in that underlying action, and we don't know what the plaintiffs are going to stress, and we don't know what the discovery is going to turn up in that action." (Id. at 22:14-22)

The decision of the Second Circuit in *World Trade Center Properties, L.L.C. v. Hartford Fire Insurance Co.*, 345 F.3d 154 (2d Cir. 2003), directly impacted the resolution of the coverage issues in this action. That decision made clear that it was the terms of the Zurich binders, and pre-binder negotiations, that controlled the coverage issues--not post-binder documents or other evidence.

**E. The Court Insists on Precision in Denying the Port Authority's Rule 12(c) Motion.**

On October 18, 2003 the Port Authority filed its Rule 12(c) motion seeking a declaration that pursuant to the "Additional Insured-Managers or Lessors of Premises" endorsement, the Port Authority is an Additional Insured and that the scope of such insurance covers "all liabilities against the Port Authority arising out of the ownership, maintenance, or use of the World Trade Center, including the claims for bodily injury and property damage arising out of the tragic events of September 11, 2001." (Lewis Aff. Ex. 32) This motion placed the controlling binder before the Court for construction.

Zurich opposed the Port Authority's Motion, first pointing out that World Trade Center Properties, LLC, the entity that Zurich had been instructed to name as insured, had not leased any property to Port Authority as required in the Endorsement. Accordingly, resolution of the Port's additional insured status claim required first resolution of the insured status claims asserted by its lessees. Zurich argued that under the Second Circuit's *World Trade Center Properties* opinion, the Zurich binders and evidence of pre-loss negotiations must be examined in order to adjudicate the Port's claim for a declaration as to insured status and as to the scope of such status. Lastly, Zurich argued that if the Port is entitled to any coverage, such coverage must be confined to its vicarious liability for actions of its lessee. (Kelly Dec. Ex. 21)

When Zurich filed its opposition brief, its legal position was amply supported. While the binder referenced a Managers or Lessors Endorsement, and the Port Authority was the lessor of the property:

(1) The Named Insured as instructed by Willis was not the lessee;

(2) Willis had not provided Zurich prior to Binder with information concerning the identity of the actual lessees; and

(3) The Managers or Lessors Endorsement as issued part of the primary policy was ambiguous concerning the identity of the Additional insured, (e.g. the Port Authority was not named in the space "Name of Person or Organization" (Additional Insured).

The Port Authority mistakenly asserts that two items of evidence render the opposition brief baseless and sanctionable. However, the "WTC diagram" referenced by the Port (Port. Auth. Mem. p. 15) did not contradict any statements made in Zurich's brief because neither this diagram nor the information therein had not been conveyed to Zurich prior to binder and had still not been conveyed to Zurich when Willis specifically directed how the Named Insured should be identified.

The 9/11 document later found in the files of Mary Merkel (the "9/11 document") does not support the Port Authority's charge because: (1) Zurich's inside and outside counsel were not aware of the document at the time Zurich filed its opposition to the Rule 12 motion; and (2) in any event, as a post-binder document not communicated outside of Zurich, the document would have been irrelevant under the Second Circuit ruling. It certainly would not have eliminated the uncertainty in the coverage created by the erroneous Willis instructions, and that uncertainty supported the position taken by Zurich in opposition to the Motion.

The Port Authority's claim that, if counsel had made a reasonable inquiry, they would have been aware of the 9/11 document is unfounded. As discussed above, Zurich's objections and negotiations explicitly defined the scope of its investigation and encountered no contemporaneous objection. It was only after the document was found—due to further efforts by Zurich's counsel—that the wisdom of hindsight has been invoked.

The problems created by Willis' instruction to name World Trade Center Properties, LLC as Named Insured were illustrated at oral argument on the Rule 12 motion. Counsel for the Port argued that because there never was a dispute that the Port was going to be the lessor, it did not

matter which WTCP entity ultimately was lessee. The Court, by contrast, insisted upon "precision" in analysis (Transcript of December 23, 2003 Conference p. 20:14; Lewis Aff. Ex. 22), pointing out that the named insured World Trade Center Properties LLC was not in fact the lessee:

> Ms. Paar: "Your Honor, it is our position, the Port Authority's position that the discussion as to who would be the named insured on the policy is really a misdirection. There never was dispute that the Port Authority was going to be the lessor and it's a basic premise . . ." (Id. p. 22:25-23:4)
>
> The Court: "But you need a lessee because we are going to get to this in scope. But there is a very good argument that the scope of liability to the lessor is related in a very substantial degree to what happens with the operation and use of the premises . . ." (Id. at 23:20-24)
>
> The Court: Who is the lessee at the time that the Port Authority was the lessor and the time of the binder? (Id. at 24:11-12)
>
> Ms. Paar: I think that the World Trade Center LLC was designated as the named insured. (Id. at 24:16-17)
>
> The Court: Was it signed as a lessee?
>
> Ms. Paar: That is not the person indicated itself on the Lease (Id. p. 24:18-20)

The Port Authority now blithely ignores the Court's critical point. "Precision" in analysis was required because the Managers or Lessors Endorsement conferred additional insured status on entities with a lessor relationship with the Named Insured. Here, the binder as prepared per Willis' instructions named World Trade Center Properties, LLC, as Named Insured which was not a lessee with the Port. While apparently Willis had erred in failing to advise Zurich of the details of the transaction, the consequences of that error could not be resolved on a Rule 12 motion, nor could they be resolved without discovery under the Second Circuit ruling.

On March 1, 2004 the Court issued its Opinion and Order denying the Rule 12(c) motion of the Port Authority (Lewis Aff. Ex. 52). The Court initially held that the Zurich binders, not the policies, were the effective instruments under *World Trade Center Properties, L.L.C. v. Hartford Fire Insurance Co.*, 345 F.3d 154, 183 (2nd Cir. 2003). The Court held that the binders were ambiguous concerning whether the Port Authority was intended to be named an additional insured; that the "Managers or Lessors" endorsement is persuasive that the parties intended the Port Authority, as lessor of the premises, to be covered as an additional insured, but "without evidence of the parties' communications to each other and evidentiary support regarding custom and Zurich's practice, I hesitate so to rule on a Rule 12 motion." (Id. p. 16) The Court further found:

> "The apparent intent of the Binder and subsequent Policies was to provide coverage for the entity having primary legal and financial responsibility for the leased World Trade Center properties. The properties are leased to the Net Lessees, however, not WTCP. The lease agreements have not been made a part of the record, and without them, the resolution of the issues presented to me would be somewhat speculative, certainly so on a Rule 12 motion. Did the Leases, for example, require the Net Lessees and/or entities owning them to indemnify and insure the Port Authority, and were the leases exhibits to Zurich, or the subject of comment or explanation to Zurich, to support an argument that the parties intended the Port Authority to be covered as an Additional Insured. The material omissions and discrepancies are difficult to understand where the financial stakes were so large and the parties so sophisticated. Nonetheless, a Rule 12 motion does not present the proper context to resolve the ambiguities. At this point in time, relatively early in the pre-trial proceedings, and in light of the many parties involved, the public interest in all aspects of the September 11 cases, and the complexity of the issues, I accept Zurich's argument that sufficient ambiguity exists to cause this branch of the Port Authority's Rule 12 motion to be denied." (Id. p. 17-18) [Emphasis Added]

With respect to scope, the Court ruled:

> "Since at this stage the parties will be engaged in discovery with regard to the issue of the Additional Insured and, presumably, that discovery will extend to the scope of coverage of such Additional Insured, it is premature to treat that question now." (Id. p. 18)

The following day, March 2, 2004, the Court conducted a Status Conference to discuss his ruling and further proceedings:

> Court: ". . . I take it there was a great deal of deliberative effort that went on to try to identify who should be the insured under the policies. With respect to the position of Zurich and other carriers that it would not extend a defense of coverage of the costs of defense, normally privilege would apply. However, as I struggled through these issues and thought about them in the course of drafting the opinion, the resolution of the issue cries out for understanding of just what was going through the minds of people. It would be very hard to deal with the issue of who should be the insured and what should be the scope of insurance without going into some of these reasons and understanding completely the positions of the parties . . ." (Transcript of March 2, 2004 Conference, p. 11:2-14; Kelly Dec. Ex. 6)
>
> Brunner: As Your Honor pointed out in your Opinion, there are going to be issues about the involvement of the Port Authority's insurance program versus the WTCP program and concerning the scope of coverage under this program for the Port Authority, assuming logic eventually prevails and the Port Authority is ultimately deemed to be an insured, an additional insured under this policy. (Id. at 10:10-16)

Given the Court's ruling, there can be no claim that the binder alone compelled Zurich to recognize the Port Authority's insured status.

**F. Discovery Supported Zurich's Contentions with Respect to the Port Authority's Claims.**

Both in the mediation context and after the mediation was unsuccessful, the parties produced documents responsive to the varying document requests. As part of this production Zurich received, for the first time, many thousands of pages of documents representing the various transactional documents in connection with the WTC lease transactions. These leases, management and operating agreements had been crafted in precise detail by the parties to the

various transactions over months of negotiations prior to binder. These documents had not, however, previously been provided to Zurich as part of the underwriting of the Zurich policies. Review of these documents further confirmed that Zurich had not been adequately apprised of the structure, organization, or participants to the transactions which formed the basis for the insurance submissions provided by Willis to Zurich.

During the months June-September 2004, sixteen days of depositions of five Zurich witnesses, including the primary underwriters Lynn Maier, Dennis Zervos, and the umbrella underwriter Keith Ragel, were conducted on all coverage issues, but principally focusing upon the defense obligation dispute. The Zurich witnesses were also deposed on insured status as well as scope and allocation issues. These depositions produced the following testimony:

(1) The Zurich primary underwriters intended that the Port Authority would be afforded additional insured status under the Managers or Lessors Endorsement (Maier 98:4-7; Kelly Dec. Ex. 10);

(2) The intended scope of such coverage was limited to the vicarious liability of the Port for actions of the named insured (Id. p. 920:1-9); and

(3) With respect to the issue posed by the Court in its March 1, 2004 ruling, the leases had not been "exhibits to Zurich, or the subject of comment or explanation to Zurich, to support an argument that the parties intended the Port Authority to be covered as an additional insured." The leases had at no time been provided to Zurich, and Zurich had no knowledge prior to binder of the identification of the proper lessees under the World Trade Center transaction. (Id. p. 928:5-15)

Therefore, based upon the discovery undertaken as of September 2004, there was evidence that the Zurich primary underwriters had intended to insure the Port Authority as lessor for its vicarious liability, but the Binder did not afford such coverage because Zurich had been instructed to name World Trade Center Properties LLC named insured and had never been apprised of the correct lessees.

G. **Zurich Acted Seasonably to Amend its Pleadings Once Warranted by Discovery.**

Based upon the discovery, Zurich sought a means to narrow the issues with the Port Authority. While the discovery supported the fact that the Port Authority was intended to have additional insured status, because the binder did not name the actual lessees the Managers or Lessors Endorsement as drafted did not afford additional insured status to the Port Authority. Zurich sought to narrow the issues by agreeing that the Port Authority should be deemed an additional insured with limitations on the scope of that coverage. By letter dated September 10, 2004 Zurich advised the Court and counsel that Zurich would shortly seek to amend its pleading to assert that the Port Authority is to be deemed to be an additional insured under the Zurich primary and umbrella policies for certain limited purposes, specifically that the scope of coverage is confined to, at most, the Port Authority's vicarious liability for the Named Insured's actions. (Lewis Aff. Ex. 37)

Pursuant to its September 9th letter, Zurich filed an Amended Complaint (Kelly Dec. Ex. 16) and on December 1, 2004 its Revised Initial and Supplemental Contentions. (Lewis Aff. Ex. 38, 29) On December 2, 2004 Port counsel sent a letter to the Court regarding an anticipated motion against Zurich seeking the Port Authority's costs and legal fees incurred in litigating Zurich's refusal to recognize "until now" the Port Authority's status as additional insured. (Kelly Dec. Ex. 15) At the December 3, 2004 Status Conference the Court made the following observations with respect to the Port Authority's request for sanctions:

> The Court: ". . . I remember the history as you put it: but I can tell you my own struggles in understanding the issues and defining the distinction between what is an additional insured and the scope of coverage. This is a very difficult case because the pleadings are somewhat ambiguous- pleadings of the plaintiffs- that spark somewhat ambiguous in terms of the allegations they make against the Port Authority. On the one hand, I am called upon possibly to decide the original design of the building. On the other hand, I am

> called upon to decide what happened when the people tried to leave on 9/11. And between those two poles, there is a whole range of activities. To decide who is an additional insured almost begs the question because I have to decide it in relation to what issues. I am not going to sanction Mr. Brunner for taking a position he took because I know how hard it was for me to understand the issues as well . . ." (Transcript of December 3, 2004 Conference p. 11:3-19; Kelly Exhibit 7) [Emphasis Added]
>
> . . .
>
> The Court: ". . . Mr. Burke, if you spent a million dollars on this legal issue, your money was misspent. This is not the case that Judge Mukasey has. I know what went on in this case. I have seen the papers. Listen, let's focus on what we have to do. ... It is not easy to deal with the restriction ownership, maintenance or use. . ." (Id. p. 12:24-13:10)

The court "pushed" Zurich counsel to agree that Zurich was "bound to the words of the policy and the words of the policy cover claims arising from the ownership, maintenance or use of the demised premises," stating:

> The Court: I am going to respond in the same way. What I am pushing Mr. Brunner to do is independent of that. I am not going to do that. I don't think it is worth judicial energy at this time until you finish the discovery. I think you all know what is going on, this is unfortunately sparring that is not needed. And I think we will all be better off if Zurich faces up to accepting the policy language and draws whatever exceptions are available to it. This is not going to solve anything. It may not even get us too far along the road, but it will avoid some of the sparring that is going on. I don't think we benefit by this. Mr. Brunner, you are walking away from the policy. You don't intend to and you don't want to you are just trying to be too careful. (Id. at 19:25-20:13) [Emphasis Added]

In April 2005, as part of its Stipulation with the WTCP entities, Zurich agreed that the Port Authority is an Additional Insured pursuant to the "Additional Insured – Managers or Lessors of Premises Endorsement" attached to the Stipulation.

## H. In Light of the Facts, the Port Authority is Clearly Not Entitled to Sanctions Under Rule 11 Against Zurich or its Counsel.

### 1. Rule 11 Sanctions are Unwarranted Because the Pre-Binding Underwriting Record Supported Zurich's Positions.

Under Rule 11(b)(3), sanctions may not be imposed unless a particular allegation is "utterly lacking in support." Zurich had support for each allegation of which the Port Authority complains in its Rule 11 claims. The fact that the Port Authority's positions also had support is irrelevant under Rule 11, and the fact that Zurich ultimately decided not to push its position to trial merits commendation, not sanction.

The Port Authority's Rule 11 claims should be viewed in the context of its bad faith claims as currently pled in this litigation. The Port Authority's "bad faith" claim alleged first that Zurich improperly "refused to defend… the Port Authority without a reservation of rights"; and second, "refused to… indemnify the Port Authority without a reservation of rights." (Fifth Counterclaim of the Port Authority and PATH p. 37, Kelly Dec. Ex. 3) The Port Authority's bad faith claims therefore encompass <u>all</u> of the coverage positions asserted by Zurich in the declaratory litigation. For example, the Port Authority's pleadings assert that Zurich's duty to provide defense coverage is so clear that withholding such coverage was bad faith. Yet the Court has granted summary judgment that no such defense duty existed as a matter of law.

This "shotgun" approach is reflective of the Port Authority's "all or nothing" position throughout this litigation: to disagree <u>in any respect</u> with the Port Authority's expansive view of its coverage is to provoke a reflexive claim for bad faith and sanctions. Of course, the Port Authority does not include defense or scope and allocation issues in its Rule 11 application; however, they have never been withdrawn as pleadings in this case and are relevant as providing context to the Port Authority's litigating posture throughout this litigation.

Under the Rule 11 standard, the binders alone provided support for Zurich's position sufficient to preclude any Rule 11 sanctions. Under the Second Circuit's decision in *World Trade Center Properties*, the terms of the binders control. The binders, per instructions of Willis, named World Trade Center Properties LLC the named insured. While, after 9/11, it was apparent that a mistake had been made in failing to provide Zurich with the correct names of the lessees, nonetheless the binders as written did not cover the lessee of the World Trade Center. As stated by the Court:

> The material omissions and discrepancies are difficult to understand where the financial stakes were so large and the parties so sophisticated. (Opinion and Order Denying R. 12 Motions p. 17; Lewis Aff. Ex. 52)

**2. The Port Authority's Categorical Position Failed to Acknowledge the "Material Omissions and Discrepancies."**

The process of rectifying the problem created by the "material omissions and discrepancies" took time and created expense to all--but the problem was not of Zurich's creation. Zurich's litigation position at all times was supported by the pre-binder underwriting record, and precludes any Rule 11 sanctions. Zurich's Amended Complaint stated that "as the owner and lessor of the World Trade Center premises, the Port Authority may be afforded some coverage under the Policies . . . , but such coverage would be confined to (at most) the Port's vicarious liability for the alleged acts or omissions of the named insured." (Lewis Aff. Ex. 17, p. 6) The Zurich Amended Complaint recognized the equity in the Port Authority position as lessor, while correctly noting that affording the Port Authority additional insured status would require that the policies be "modified" to reflect the appropriate Net Lessees under the transactions first disclosed to Zurich after 9/11. (Id.)

While the Port Authority was unquestionably the lessor of the World Trade Center premises, and the Zurich primary binder referenced a "Managers or Lessors Endorsement",

World Trade Center Properties LLC, the entity that Zurich had been specifically instructed to name as insured, had not leased any property to the Port Authority as required by the Endorsement. Suffice it to say that, while the underwriting record provided evidence that the Port Authority was intended to be an Additional Insured, based upon the terms of the Zurich binders that had named World Trade Center Properties LLC as Named Insured per direction of Willis, the Port Authority was not entitled to such status. Zurich sought to resolve this issue, first unsuccessfully through mediation, and second through declaratory relief from this Court. There was support for the positions that Zurich took in its pleadings, contentions and opposition to the Port Authority Rule 12 motion. The Port Authority's entitlement to additional insured status was uncertain based upon the structure of the lease agreements that had not been disclosed to Zurich and based upon the identity of the Named Insured that Zurich was directed by Willis to name.

The process of resolving the insured status issue with the Port Authority was further complicated by the Port Authority's position, best exemplified in its bad faith claim, that it was entitled to defense and indemnity "without reservation" and thus its status was inextricably entwined with coverage for any and all claims against it without reservation and in preference to coverage available under the Port Authority's own insurance program. This position is illustrated in its responsive pleadings, its contentions, its Rule 12 motion, its reaction to Zurich's amendment of pleadings in 2004, its reaction to the April 2005 Stipulation, and its summary judgment briefing. In each instance the Port Authority confirmed that it was not interested in status alone, but only status with unlimited coverage.

The deposition discovery in 2004 provided evidence to support the conclusion that the Port Authority, as lessor, had been intended to be an additional insured, but the discovery also confirmed that Zurich's underwriters had not been apprised of the lease or other documents, nor

of the identity of the proper lessees, before binder, resulting in a situation where the binder did not afford additional insured status because the named insured thereon was not the lessee. Deciding what the binder meant was not a simple matter of correcting an obvious scriveners error but, instead, required information from the complex transaction to be fit together.

Zurich sought to address the situation by narrowing the issues in 2004, amending its pleadings to provide that the Port Authority was an additional insured with the scope of the intended coverage limited to vicarious liability. This attempt was met with rejection by the Port Authority, which threatened sanctions.

In December 2004 the Court "pushed" Zurich to "accept the proposition that Zurich is bound to the words of the policy and the words of the policy cover claims arising from the ownership, maintenance or use the demised premises." (Transcript December 3, 2004 Conference p. 15; Kelly Dec. Ex. 7) In so stating, the Court noted:

> This is not going to solve anything. It may not even get us too far along the road, but it will avoid some of the sparring that is going on. I don't think we benefit by this. (Id. p. 19)

Zurich listened to the Court.

In early 2005 Zurich discussed with the World Trade Center Properties Entities possible resolution of insured status issues. (Transcript April 13, 2005 Conference p. 2, Kelly Dec. Ex. 17) These discussions culminated in a Stipulation dated April 13, 2005, whereby Zurich agreed that the WTCP Net Lessees are Named Insureds under the Zurich policies pursuant to the Broad Form Named Insured Endorsement annexed to the Stipulation, that the Port Authority is an Additional Insured pursuant to the "Additional Insured--Managers or Lessors of Premises Endorsement" attached to the stipulation: that PATH is an Additional Insured pursuant to the "Automatic Additional Insured endorsement attached to the Stipulation, and that the

endorsements attached as exhibits to the Stipulation are the endorsements referenced in the July 19, 2001 primary binder and were intended to Form part of the primary Zurich policy. (Lewis Aff. Ex. 46)

Zurich had, of course, previously amended its pleadings and contentions to provide that the Port Authority was an Additional Insured for some purposes. However, Zurich had been unable to confirm that the source of such status was the Managers or Lessors Endorsement because the Named Insured under the binder as issued was not the lessee. The Stipulation with WTCP provided the means for recognition that the source of the Port Authority's Additional Insured Status was the "Managers or Lessors Endorsement" because the Stipulation provided that the Net Lessees, the entities with the contractual relationship with the Port Authority were Named Insureds under the policy. At the April 13, 2005 conference, Port counsel characterized the Stipulation as "a very positive step that Zurich has made." (Transcript April 13, 2005 Conference p. 18:11-12, Kelly Dec. Ex. 17)

Despite the "very productive step" that Zurich had made, the Port Authority continued to maintain its inflexible position. First, it requested that Zurich consent to a judgment that the Port Authority is an additional insured for all claims arising out of the ownership, maintenance and use of the World Trade Center. Zurich refused to consent because the judgment requested went beyond the language in the endorsement, which specifically provides that the coverage afforded by the endorsement "does not apply" in certain circumstances such as "structural alterations, new construction or demolition operations performed by or on behalf of the person or organization shown in the Schedule." The Port Authority proceeded to file a motion for summary judgment on this issue seeking the same relief, only to ultimately agree to an order that correctly notes the source of additional insured status but does not go beyond into scope issues as the Port's

originally proposed consent order had provided. (Lewis Aff. Ex. 53) Second, the Port Authority pursued a claim that the Automatic Additional Insured endorsement in the Stipulation with World Trade Center Properties was not the correct endorsement referenced in the binder.[3] When Zurich refused to agree to the Port Authority's position, the Port Authority filed a motion for summary judgment on this issue as well. The Port Authority ultimately agreed to a consent order that did not resolve this issue but that deferred consideration of the issue for a later date.

The process of discerning the intent of the parties in an attempt to rectify the "omissions and discrepancies" not caused by Zurich took time, but ultimately resulted in a recognition of insured status to the Port Authority. At all times, however, there was ample support for Zurich's insured status position sufficient to preclude Rule 11 liability.

## IV. THERE IS NO BASIS FOR IMPOSITION OF RULE 37 SANCTIONS.

### A. Zurich's Document Production Efforts Were Reasonable.

#### 1. Zurich Acted Reasonably in Defining the Scope of its Document Search.

By March 2003 the Wiley, Rein firm had collected copies of many Zurich documents from many sources, including some from the files of Mary Merkel, Chief Underwriting Officer for the Zurich division that had responsibility for general liability insurance, whose office was in Schaumburg, Illinois. *See* Declaration of Leslie A. Platt (Mar. 15, 2007) ¶ 3 ("Platt Decl."). These materials initially were reviewed by an associate assisting the partner charged with assembling the documents. Id. He did not report anything to the partner that appeared significant, and in particular he did not mention the document printed out on 9/11 and maintained in Ms. Merkel's files (the "9/11 document"). Id.

---

3 In April 2005, as part of its Stipulation with World Trade Center Properties, Zurich stipulated that the source of the Port Authority Additional Insured coverage that Zurich had previously agreed to was the Managers or Lessors Endorsement

Zurich first produced documents on or about March 24, 2003 in connection with the mediation. Id. ¶ 4. Zurich's mediation production consisted of documents located in the underwriting files maintained by the Zurich employees who were responsible for underwriting the primary and umbrella policies issued by Zurich to World Trade Center Properties LLC. During Wiley Rein's investigation, Zurich personnel informed them that the underwriting occurred in New York and that Ms. Merkel had not been responsible for the underwriting or issuance of the binder. Id. Accordingly, the mediation production did not include Ms. Merkel's files.

When the mediation was unsuccessful, the parties served requests for production. There was negotiation over the scope of Zurich's obligations, as described in the attached declaration by Keith S. Watson. *See* Declaration of Keith S. Watson (Mar. 15, 2007) ¶ 3 ("Watson Decl.") Zurich ultimately agreed that it would produce documents only from the files of the Zurich personnel who were responsible for underwriting the policies. Id. This scope of production was explicitly stated in Zurich's objections. Although other aspects of the objections were challenged before the Court, the stated scope was not. Id. ¶ 5. Again, because counsel understood that Ms. Merkel was not responsible for underwriting the policies, counsel concluded that Zurich need not search her files for documents responsive to the document requests. Id. ¶ 13; Platt Decl. ¶ 4.

**2. After Being Alerted to the 9/11 Document, Zurich Promptly Produced It.**

In late 2004 opposing counsel asserted that an e-mail sent by Zurich primary underwriter Lynn Maier indicated that a policy document had been deleted from Zurich's computer system. Platt Decl. ¶ 8. On January 11, 2002 Maier had sent an email to Dorothy Kelly, the Zurich employee in charge of the New York account assistants, asking Kelly to "confirm ASAP that the

old version of the policy has been deleted from the document library and replaced with the final corrected policy."(Lewis Aff. Ex. 14) Maier considered the document in the document library to be the billing copy of the policy as opposed to the final one that she approved and sent. (Maier Dp. 785:1-786:14; Kelly Dec. Ex. 10). Ms. Maier never saw the document about which she inquired in her email. (Id. at 795:3-16). Based upon her testimony that the document was a "billing copy of the policy," the document would have been prepared internally at Zurich after issuance of the binder.

In response to opposing counsel's contentions, Zurich's counsel undertook to investigate further. Platt Decl. ¶ 8. In early February 2005 in-house counsel mentioned to Mary Merkel the issue concerning an alleged deleted document, and Ms. Merkel stated she might have something relevant to the question in her files. Id. ¶ 9.

Ms. Merkel explained that on the morning of September 11th, as it became clear that a disaster was occurring, she had asked her assistant, Frank Strop, to find a copy of the primary policy for the World Trade Center in order to obtain information limits of the policy. (Merkel Dp. P. 78:22-10, Kelly Dec. Ex. 12) Because she was not involved with the underwriting, she did not know the policy limits or whether a primary policy had been issued.[4] (Merkel Dp. P. 82:10-23; Kelly Dec. Ex. 12) Mr. Strop printed a document from the Zurich PRIDE system and gave it to Ms. Merkel. (Id. p. 85:3-5) Ms. Merkel checked the policy limits and then retained the document in her file. She did not know one way or the other whether the document was or was not the final policy. (Id. p. 84:17-85:5) Ms. Merkel subsequently testified that she did not recall any conversations with Ms. Maier about an old version of the policy, about replacing any

[4] In deposition, Ms. Merkel referred to one telephone call she received as "involvement" with the World Trade Center Program. (Id. p. 67:19-68:9) Simply stated, that one call did not involve her in the underwriting. Indeed, the 9/11 document that is the focus of commentary on her files was not there because of the call or any involvement in underwriting, but because she checked policy limits on 9/11.

version of the policy on the Document Library, or about deleting an old version of the policy. (Id. at 240:18-241:14) Mrs. Merkel had no knowledge of any version of the policy relating to the World Trade Center being deleted from the Document Library. (Id. p. 241:15-19) Nor was any information developed during discovery about when any deletion occurred.

The PRIDE system from which Mr. Strop obtained the policy documentation on 9/11 is a Zurich system that "rates" policies and that is used to begin the preparation of a policy from information contained in the binder. (Id. p. 77:14-17; 215:9-24) The PRIDE System generally uses ISO based forms selected by the underwriter or underwriting assistant. The PRIDE System does not automatically insert manuscript forms which must be selected and attached by the underwriter or underwriters assistant. (Id. p. 215:9-216:16)

As a matter of Zurich custom and practice in 2001, the underwriting assistant for the underwriter on the World Trade Center properties primary policy would have input information into PRIDE that would lead to creation of the 9/11 document. (Id. p. 87:18-88:7; Kelly Exhibit 12) Ms. Merkel had no information to suggest that this practice was not followed in the case of the 9/11 document. (Id. p. 96:21-97:4) However, neither Lynn Maier, the Zurich primary underwriter responsible for preparation of the policy, nor her underwriting assistant Ms. Matos, recalled having had any involvement in the preparation of the 9/11 document.

The 9/11 document was not consistent with the terms of the binder in significant respects. For example (1) it incorrectly listed WTC 1-7—the entire seven-building World Trade Center complex—as the designated premises rather than just 1, 2, 4, and 5 WTC as requested by Willis (Lewis Aff. Ex. 10); and (2) it did not include an endorsement excluding any defense obligation, as was the agreement as memorialized in the Binder. It included a "Broad Form Named Insured Endorsement" providing named insured status:

> World Trade Center Properties LLC c/o Silverstein Properties, Inc and any subsidiary company as now formed or constituted, and any other company over which the named insured has active control so long as the named insured or any subsidiary company has an ownership interest of more than 50 percent of such company.

The Broad Form Named Insured Endorsement contained in the 9/11 document was not included in the primary policy as issued.

After Ms. Merkel's statement to in-house counsel in early February 2005, Wiley Rein immediately checked and the 9/11 document was discovered in Ms. Merkel's files, including the copies that were part of the large volume of documents assembled by Wiley Rein in March 2003. Platt Decl. ¶ 10; Brunner Decl. ¶ 14. Zurich immediately advised all counsel that these documents existed and would be promptly produced. (Zurich's Consolidated Memorandum of Law; Lewis Aff. Ex. 41) The Court thereafter by Order of February 17, 2005 directed that the documents be produced "immediately," and the documents were produced on February 18, 2005. (Lewis Aff. at Exhibit 42) At the Court's direction Zurich also filed a letter explaining the circumstances of the production (Kelly Dec. Ex. 13) and, subsequent thereto, a chronology of Zurich's document productions which included an explanation for the February 2005 production. (Lewis Aff. Ex. 9)

Zurich identified the places relevant document were likely to appear and searched there, openly stating what it was doing. There was no evidence that a likely source of important material had been unreasonably disregarded during Zurich's document production.

**3. Subsequent Discovery Ordered by the Court Was Limited in Scope.**

At the time in February 2005, the Court was considering motions by the Westfield entities and the Port Authority, among others, for significant additional deposition discovery. These motions sought dozens of additional depositions on all the coverage issues pending before the Court, including defense, insured status, scope and allocation. By Opinion and Order of

February 23, 2005, the Court denied the motions for further depositions with leave to renew upon a proper showing of the relevance of depositions of specified witnesses, and set forth therein "the issues that appear to be relevant":

> 1. Under New York law, the intent of a contract of insurance, like all contracts, is governed by objective intent, that which the parties communicated to the other, and the promisee's reasonable understanding on the basis of such communications.... Accordingly, the private beliefs or understandings of witnesses as to how contract clauses might interpreted, or how they may have been applied or interpreted in previous cases, are not relevant and should not be asked. Only the reasonable expectations of the insureds, as the intended recipients of communications containing representations and promises, may be the subject of inquiries.
>
> 2. Custom, usage and common practice regarding the interpretation of clauses may be relevant to resolve ambiguities or to explain why particular clauses may have been chosen,...but only with regard to witnesses who have knowledge of relevant custom, usage and practices, or are tendered as experts on such subjects....
>
> 3. Since the binders in existence on September 11, 2001 form the contract, the policies ultimately issued are not relevant, except as to such limited relevance they might have to help resolve ambiguities in the binders...the insurer cannot prove a proposition relating to the meaning of a binder by the language of a clause in the policy that it ultimately issued, and the insured may not ask why certain clauses, and not others, formed the ultimate policy. Accordingly, the insureds' request to take depositions of "persons with knowledge of the existence, creation and interpretation of Zurich forms and internal guidelines," or its alleged "underwriting inconsistencies," or its "claims handling" are not relevant to interpreting the meaning of the clauses of the binders, and leave to take such depositions is not granted. The meaning of promises made, as reasonably understood by promisees or their agents, including the insuring clauses that the promisees or their agents reasonably expected to be included in the policies, are the proper scope of questioning at depositions.
>
> 4. Any charges that Zurich spoliated evidence and should made the subject of a separate motion, giving rise to such sanctions, if the charges are proved, as may be appropriate to the circumstances of the spoliation and potential relevance of the lost

> evidence.... (Opinion and Order of February 23, 2005; Lewis Ex. 43, p. 4-6)

Thereafter, the Westfield entities renewed their motion for additional depositions. By Order of April 4, 2005 the Court granted leave to depose certain persons specifically named by the parties in their papers, with "the scope of depositions...confined to my holdings in my Opinion Orders of March 1, 2004... and February 23, 2005." (Kelly Dec. Ex. 2)

### B. Considered in the Context of the Litigation as a Whole, Zurich's Discovery Activities Were Reasonable and Do Not Warrant Sanctions.

At the Court's direction, Zurich submitted a letter to the Court and a chronology of its document productions, and these submissions have now been supplemented with Declarations of the Zurich outside counsel involved in the document production. As stated therein, the Merkel file was not included in productions because she had not been involved in the actual underwriting of the WTCP policies.

This is not a situation in which a known or suspected document was intentionally excluded from discovery. Until February 2005 outside counsel responsible for the underwriting production did not know or suspect that the 9/11 document existed or that a copy was located in files in the possession of Wiley Rein. Platt Decl. ¶ 12; Watson Decl. ¶ 14. Nor is this a situation in which a likely source of important documents was disregarded. The whole story is that Zurich agreed to produce from the files of persons responsible for underwriting the policies, Zurich did that, and the 9/11 document was not part of the universe. As soon as Zurich learned of the document, it was produced.

The circumstances attendant to production of Ms. Merkel's files do not warrant sanctions under Rule 37. No order was violated. Zurich made a reasonable search for responsive materials and produced what it found. Nor was there a failure to seasonably update prior responses. When the 9/11 document came to the attention of Zurich's counsel, they produced it promptly.

But even if some violation had occurred, sanctions should not be imposed. As noted above, factors to be considered in assessing sanctions include the party's explanation for the discovery violation, the importance of the evidence, and the prejudice to the other party. We have discussed Zurich's explanation of what occurred. We turn now to discussion of the importance of the evidence and any prejudice to the other party.

As an internal Zurich document generated post-binder and not communicated to Willis or any of the insureds, the 9/11 document was not relevant evidence under *World Trade Center Properties* and the Court's discovery rulings, including its February 23, 2005 Opinion regulating discovery. (Lewis Aff. Ex. 43) The chain of inferences by which the Port Authority seeks to give the 9/11 document some relevance are speculative at best.

On the question of prejudice, prior to the February 2005 supplemental production Westfield, the Port Authority and others had filed Motions seeking dozens of additional depositions. Unwilling to endorse this overbroad request for further depositions, the Court issued its February 23, 2005 Opinion. (Lewis Aff. at Exhibit 43) The Court subsequently permitted additional depositions on issues identified in its February 23rd Opinion, only one issue being supplemental production of documents. Pursuant to the Court Order, eleven additional depositions of Zurich personnel were conducted, only four of which were of persons who had been deposed previously. To summarize with respect to prejudice, seven of the eleven Zurich witnesses deposed after the February 2005 production had been requested by counsel prior to the production; only four of the eleven Zurich witnesses deposed after the production were re-deposed on issues relating to the production.

Considering the "full record of the case", Zurich's explanation for the discovery violation, the lack of relevance of the evidence, and the relative lack of prejudice to the Port Authority. Zurich submits that sanctions under Rule 37 are inappropriate.

The spoliation of evidence claim contained within the sanctions motion similarly lacks merit. As explained in Mr. Brunner's declaration, at a meeting on January 7, 2002 the primary and umbrella underwriters were instructed to preserve all communications relating to the WTC underwriting. Brunner Decl. ¶ 5. While on January 11th Lynn Maier sent an email requesting confirmation that a document had been deleted, the circumstances do not warrant sanctions for spoliation. First, a "hold" had been placed on destruction of documents prior to that date. Second, there is no confirmation that the document was deleted with " culpable state of mind." Lastly, from the deposition discovery it appears that this document would have been created post-binder. As a post-binder document generated by Zurich and not exchanged with any of the other parties, it would therefore be irrelevant under the Second Circuit ruling and this Court's February 23, 2005 Opinion. Finally, the 9/11 document was preserved and produced.

Were sanctions appropriate for Zurich's conduct—and they are not—they should be tailored to the specific "prejudice" caused by the late production in February 2005. The Court allowed eleven additional days of deposition of Zurich witnesses, seven witnesses who had not been previously deposed and four who were re-deposed on issues including the supplemental production. These depositions were concluded prior to May 31, 2005, after which briefing on summary judgment took place. Any sanctions considered by the Court should relate to the fees and costs incurred during the months of February, March, April and May 2005 and directly relevant to the supplemental production and the questions at deposition relating to the supplemental production.

REDACTED PER JUDGE HELLERSTEIN'S

ORDER OF MARCH 8, 2007

REDACTED PER JUDGE HELLERSTEIN'S

ORDER OF MARCH 8, 2007

REDACTED PER JUDGE HELLERSTEIN'S

ORDER OF MARCH 8, 2007

REDACTED PER JUDGE HELLERSTEIN'S

ORDER OF MARCH 8, 2007

## VI. CONCLUSION

For the reasons set forth above, the Court should deny the Port Authority's motion for sanctions in all respects.

Dated: March 19, 2007

Respectfully submitted,

/s/ KEVIN T. COUGHLIN
Kevin T. Coughlin (KC 8550)
Robert J. Kelly (RK 4955)
COUGHLIN DUFFY LLP
88 Pine Street
New York, NY 10005
(212) 483-0105

*Attorneys for Zurich American Insurance Company*

Thomas W. Kirby
- (Pro Hac application pending)
John E. Barry (Pro Hac Vice)
Thomas W. Brunner
WILEY REIN LLP
1776 K Street, NW
Washington, DC 20006
(202) 719-7000