UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— X

                                        No. 03 CV 0332 (AKH)

IN RE SEPTEMBER 11TH LIABILITY
INSURANCE COVERAGE CASES

———————————————————————— X

**REPLY MEMORANDUM OF LAW IN SUPPORT OF THE PORT AUTHORITY'S
AND THE PATH CORPORATION'S MOTION FOR SANCTIONS**

.

**TABLE OF CONTENTS**

<u>Page</u>

TABLE OF AUTHORITIES ............................................................................... ii

PRELIMINARY STATEMENT ...........................................................................1

ARGUMENT ......................................................................................................2

I.     NEITHER COUGHLIN DUFFY NOR ZURICH HAS SUBMITTED ANY
       EVIDENCE TO REFUTE THAT THEY ENGAGED IN SANCTIONABLE
       CONDUCT .............................................................................................2

II.    THE PORT AUTHORITY PARTIES ARE CLEARLY ENTITLED TO RULE 11
       SANCTIONS .........................................................................................6

         **A.**     The Well-Established Standard Applicable to Rule 11 Sanctions Has Not
                Been Refuted.......................................................................................6

         **B.**     The Answering Papers Fail To Refute That Zurich And Its Counsel Did Not
                Undertake A Reasonable Investigation Inasmuch As Information Available
                To Them Prior To The Commencement Of The Lawsuit Revealed That
                Zurich's Claims With Respect To The Status Issue Lacked Evidentiary
                Support ................................................................................................7

         **C.**     The Answering Papers Fail To Refute The Evidence That Throughout The
                Course Of This Litigation Zurich And Its Counsel Continued To Take
                Positions In Pleadings And Other Papers With Respect To The Status Issue
                That Lacked Evidentiary Support .........................................................9

         **D.**     Zurich's Procedural Arguments Are Meritless .....................................14

III.   RULE 37 SANCTIONS FOR DISCOVERY ABUSES ARE WARRANTED FOR
       ZURICH'S LATE PRODUCTION OF DOCUMENTS AND DESTRUCTION OF
       DOCUMENTS.......................................................................................18

IV.   SANCTIONS AGAINST ZURICH'S COUNSEL ARE WARRANTED
       PURSUANT TO 28 U.S.C.A. § 1927 ................................................22

V.     ZURICH'S ATTACK ON THE FEE APPLICATIONS LACKS MERIT .....................22

CONCLUSION....................................................................................................29

## TABLE OF AUTHORITIES

Page

Cases:

*Brisbane v. Port Auth. of N.Y. & N.J.*, 550 F. Supp. 222 (S.D.N.Y. 1982) ................................. 27

*Dellefave v. Access Temporaries, Inc*, No. 99 Civ. 6098, 2001 WL 286771
   (S.D.N.Y. Mar. 22, 2001) ................................................................................... 6, 7

*Durant v. Traditional Invs., Ltd.*, 135 F.R.D. 42 (S.D.N.Y. 1991)................................. 6

*Eastway Constr. Corp. v. New York*, 762 F.2d 243 (2d Cir.1985) ................................. 6

*Edstrom v. Nat'l Incentive Servs., Inc.*, No. 85 Civ. 3701, 1988 WL 13717
   (S.D.N.Y. Feb. 11, 1988) .................................................................................... 7

*Ford Piano Supply Co. v. Steinway & Sons*, No. 85 Civ. 1284, 1988 WL 3488
   (S.D.N.Y. Jan. 13, 1988)..................................................................................... 7

*Gold v. Last Experience*, No. 97 Civ. 1459, 1999 WL 156005 (S.D.N.Y. Mar. 22, 1999)........... 7

*Gonzalez v. Bratton*, 147 F. Supp. 2d 180 (2001)........................................................ 24, 27

*Holmes v. NBC/GE*, 168 F.R.D. 481 (S.D.N.Y. 1996) ................................................. 27

*Int'l Shipping Co., S.A. v. Hydra Offshore Inc.*, 875 F.2d 388 (2d Cir.1989) ............... 6

*Jeffreys v. Rossi*, 275 F. Supp. 2d 463 (S.D.N.Y. 2003), *aff'd, Jeffreys v. City of New
   York*, 426 F.3d 549 (2d Cir. 2005) ................................................................... 16, 17

*King World Prods., Inc. v. Cmty. Broad. of Coastal Bend, Inc.*, No. 89 Civ. 2844, 1990
   WL 67399 (S.D.N.Y. May 17, 1990) .................................................................... 7

*Leptha Enters., Inc. v. Longenback*, No. 90 Civ. 7704, 1991 WL 183373
   (S.D.N.Y. Sept. 9, 1991) .................................................................................... 7

*Manhattan Life Ins. Co.v. A.J. Stratton Syndicate (No. 782)*, 132 F.R.D. 139
   (S.D.N.Y. 1990).......................................................................................... 6, 7

*Marisol A. ex rel Forbes v. Giuliani*, 111 F. Supp. 2d 381 (S.D.N.Y. 2000) ......................... 24, 28

*Maritime Inspection Servs., Inc. v. Thermo-Vales Corp.*, No. 90 Civ. 7286, 1993 WL
   43421, (S.D.N.Y. Feb. 18, 1993) ........................................................................ 7

*McKay v. Barnhart*, 327 F. Supp. 2d 263 (S.D.N.Y. 2004) ........................................ 28

*Mopaz Diamonds, Inc. v. Inst. of London Underwriters*, 822 F. Supp. 1053
   (S.D.N.Y. 1993) ............................................................................................ 6

*Pannonia Farms, Inc. v. USA Cable*, No. 03 Civ. 7841, 2004 WL 1276842
   (S.D.N.Y. June 8, 2004)................................................................................ 16, 17

*Pittsburgh Plate Glass Co. v. Fid. & Cas. Co. of N.Y.*, 281 F.2d 538 (3d Cir. 1960)................. 27

*Profile Pub. & Mgmt. Corp. APS v. Musicmaker.com, Inc.*, No. 01 Civ. 2886, 2003 WL
   1785798 (S.D.N.Y. Apr. 2, 2003)........................................................................ 7

*Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d 417 (S.D.N.Y. 1999) ...................... 24, 28

*Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*, 277 F. Supp. 2d 323 (S.D.N.Y. 2003).......... 24

DOCSNY-240562v05

*Silberman v. Innovation Luggage, Inc.*, No. 01 Civ. 7109, 2003 WL 1787123
(S.D.N.Y. Apr. 3, 2003) ........................................................................................... 6

*Takeda Chem. Indus. Ltd. v. Mylan Labs., Inc.*, Nos. Civ. 8253, 04 Civ. 1966, 2007 WL
840368, at *8 n.7 (S.D.N.Y. Mar. 21, 2007) ........................................................ 26

*Wischmeyer v. Wischmeyer*, No. 05 Civ. 6134, 2006 WL 3257419
(W.D.N.Y. Nov. 9, 2006) ......................................................................................... 7


<u>Statutes and Rules</u>:

28 U.S.C.A. § 1927 ........................................................................................... 1, 17, 22

Fed. R. Civ. P. 11 advisory committee note ....................................................... 6, 14

Fed. R. Civ. P. 11 ............................................................................................... *passim*

Fed. R. Civ. P. 12 .................................................................................................. 10, 11

Fed. R. Civ. P. 37 ............................................................................................. 15, 17, 18

DOCSNY-240562v05

.

## PRELIMINARY STATEMENT

The Port Authority of New York and New Jersey ("Port Authority") and The Port Authority Trans-Hudson Corporation ("PATH") (collectively, the "Port Authority Parties") submit this memorandum of law in further support of their motion for sanctions against Zurich American Insurance Company ("Zurich") and its present and former outside counsel, the law firms Coughlin Duffy, LLP and Wiley Rein LLP, respectively (collectively, Zurich's "counsel"), pursuant to Rules 11 and 37 of the Federal Rules of Civil Procedure and 28 U.S.C.A. § 1927.

Zurich's Memorandum In Opposition To The Port Authority And PATH's Motion For Sanctions ("Zurich's Answering Brief") exhaustively chronicles the proceedings in this action and blames everyone but themselves, from an unnamed former Wiley Rein associate to the Port Authority Parties, for this protracted litigation, Zurich fails, however, to controvert the following core truths:

- Prior to suing the Port Authority Parties, Zurich and/or its counsel were in actual possession of all information necessary to determine that the Port Authority Parties are additional insureds under the Zurich binders and policies (the "Status Issue");

- Zurich and its counsel either failed to make a reasonable investigation prior to initiating suit against the Port Authority Parties, or disregarded the information they had demonstrating that: the Port Authority Parties were intended to be additional insureds under the Zurich primary and umbrella policies (the "Zurich Policies"); and that the entities to which the Port Authority Parties leased the World Trade Center ("WTC") premises were intended to be named insureds under the policies;

- Zurich and its counsel continued to litigate the Status Issue for years thereafter despite the fact that deposition testimony of Zurich's underwriting witnesses confirmed that the Port Authority Parties were always intended to be additional insureds under the Zurich Policies;

- Zurich and its counsel failed to timely produce documents specifically requested by the Port Authority

> Parties' document requests, necessitating the re-deposition of Zurich witnesses; Wiley Rein's attempt to blame this disclosure failure on an unnamed, former associate does not relieve it of responsibility for Rule 37 sanctions; and
>
> - Zurich destroyed evidence bearing directly on key issues in this case, and it is immaterial whether the spoliation of documents was carried out for an improper purpose.

Unable to defeat on the merits the arguments advanced in the Port Authority Parties' moving memorandum of law and supporting affirmations (collectively, the "Moving Papers"), Zurich and its counsel rely instead on a specious attack of the Port Authority Parties' fee application. Despite the argument of Zurich and its counsel, which is without legal support, the fee application is not defective and should not be rejected.

## ARGUMENT

### I.   NEITHER COUGHLIN DUFFY NOR ZURICH HAS SUBMITTED ANY EVIDENCE TO REFUTE THAT THEY ENGAGED IN SANCTIONABLE CONDUCT

As set forth clearly in the Moving Papers, the Port Authority Parties seek the imposition of sanctions against (1) Wiley Rein, Zurich's former counsel, (2) Coughlin Duffy, Zurich's counsel throughout the course of this entire litigation, and (3) Zurich. It is undisputed that all three entities played instrumental roles during every step of this litigation. Indeed, as explained by Keith Watson of Wiley Rein, he and his partners "worked closely on deposition and document discovery issues with co-counsel, Kevin Coughlin and Robert Kelly, and with senior in-house counsel for Zurich Decl." (Watson Decl. ¶ 2). *See also* Zurich's Answering Br. at n. 2 ("Given the nature of this case, senior in-house Zurich counsel remained closely involved throughout, providing ongoing supervision to Zurich's team of outside counsel.").

The Port Authority Parties' Moving Papers demonstrated that all three entities engaged in sanctionable conduct by failing to conduct a reasonable investigation with respect to the Status

2

Issue prior to commencing this lawsuit, and by presenting pleadings and other papers to the Court, throughout the course of this litigation, which advanced positions on the Status Issue that lacked evidentiary support. *See* Moving Br. at 6-30. Yet, neither Coughlin Duffy nor Zurich submitted declarations and/or affidavits to refute the Port Authority Parties' contentions.[1]

Coughlin Duffy does not deny, *inter alia*, that:

- it participated in every Court appearance and attached its name to the representations contained in every document, whether it was a pleading or a motion, that was submitted to this Court. *See, e.g.*, Affirmation of Joan L. Lewis In Support of the Port Authority Parties Motion for Sanctions ("Lewis Moving Aff."), Ex. 19, 21, 41;

- since at least March 2003, it possessed or had access to a version of the primary policy printed out by Mary Merkel's assistant on September 2001(the "Pre-Loss Policy") and retained in Ms. Merkel's files, which demonstrated that the WTCP LLP operating entities to which the Port Authority leased the WTC Premises (the "Net Leases") were intended to be Named Insureds under the Zurich Policies;

- it commenced, and for three years litigated vigorously, the Status Issue despite possessing and/or having access to information that wholly undermined Zurich's position with respect to that issue;

- it failed to timely produce relevant discovery, including the Pre-Loss Policy; and

- it failed to take appropriate measures to protect against destruction of critical evidence including, *inter alia,* drafts and/or versions of the Zurich primary policy and form and manuscript endorsements available for use by Zurich underwriters in July 2001 to provide additional insured coverage.

Moreover, by failing to submit any declarations and/or affidavits, Coughlin Duffy has made absolutely no showing that it conducted any, much less a reasonable, investigation prior to

---

[1] The only aspect of the Port Authority Parties' motion for sanctions that Coughlin Duffy disputes is the amount of the legal fees and costs to which the Port Authority Parties are entitled.

DOCSNY-240562v05

bringing the instant lawsuit against the Port Authority Parties.[2]   Accordingly, inasmuch as Coughlin Duffy has failed to make a showing that sanctions are unwarranted, the only open issue for the Court to decide is the appropriate amount of sanctions that should be imposed against Coughlin Duffy.

Similarly, Zurich has remained silent in the face of the Port Authority Parties' motion. Neither its in-house counsel nor any of its employees submitted declarations and/or affidavits seeking to rebut the Port Authority Parties' contentions, *inter alia*, that Zurich:

- failed to conduct a reasonable investigation to determine whether the Port Authority Parties were intended to be additional insureds under the Zurich Policies;

- commenced this lawsuit against the Port Authority Parties and continued to litigate the Status Issue notwithstanding that its employees responsible for underwriting the Zurich Policies knew that the Port Authority Parties were intended to be additional insureds under the Zurich Policies;

- at all relevant times possessed, either in its computer system or in hard copy the Pre-Loss Policy which demonstrated that the Net Lessees were intended to be Named Insureds under the Zurich Policies, thus undercutting Zurich's claim that the Port Authority had leased the WTC premises to entities that were not insured under the Zurich Policies;

- failed to timely produce relevant discovery, including most significantly a copy of the Pre-Loss Policy;

- failed to take appropriate measures to protect against the destruction of critical evidence, including drafts and/or versions of the Zurich primary policy and form and manuscript endorsements available to Zurich underwriters in July 2001 to provide additional insured coverage; and

---

[2] The only evidence bearing on whether Coughlin Duffy conducted a reasonable investigation of Zurich's claims with respect to the Status Issue prior to commencing suit is a brief comment in the Declaration of Thomas W. Brunner ( "Brunner Decl.") that Kevin Coughlin was present at a meeting with Zurich employees and Zurich's in-house counsel on January 7, 2002 in which they purportedly cautioned those employees to preserve "communications."  *See* Brunner Decl. ¶ 5.

4

- discarded pertinent evidence by deleting from the company's computer system copies of, among other things, drafts and/or versions of the primary policy and form and manuscript endorsements available for use by Zurich underwriters in July 2001 to provide additional insured coverage.

Zurich's failure to deny any of these allegations is not surprising since its employees testified under oath during depositions taken in this case that: (1) the Port Authority Parties were intended to be additional insureds under the Zurich binders and policies;  (2) critical evidence, including drafts and/or versions of the primary policy, and copies of form and manuscript endorsements available for use by Zurich underwriters in July 2001 to provide additional insured coverage, has been destroyed;  (3) no one at Zurich ever asked them, prior to Zurich's commencement of this lawsuit, whether the Port Authority Parties were intended to be additional insureds;  and (4) no one ever directed them to preserve evidence. [3]

Accordingly, inasmuch as Zurich failed to put in any declarations and/or affidavits by its employees or in-house counsel to refute the Port Authority Parties' demonstration that Zurich's conduct was sanctionable, the sole issue outstanding with respect to Zurich is the portion of the sanctions for which it is responsible.

---

[3]For example, Lynn Maier, the underwriter for the Zurich primary policy, testified that the Port Authority was intended to be, and is, an additional insured under the Zurich Policies.  June 9, 2004 Maier Dep. at 93-98 (Lewis Moving Aff., Ex. 15).  Ms. Maier also testified that no one at Zurich ever asked her whether the Port Authority was intended to be covered under the Zurich Policies.  *See* July 21, 2004 Maier Dep. at 1124, LL. 3-8 (Lewis Moving Aff., Ex. 15); *see also* Moving Br. at 36-40.

## II.  THE PORT AUTHORITY PARTIES ARE CLEARLY ENTITLED TO RULE 11 SANCTIONS

### A.  The Well-Established Standard Applicable to Rule 11 Sanctions Has Not Been Refuted

Although Zurich's Answering Brief contains various references to Rule 11 standards, none of which are supported by a single case citation, the following standard applicable to Rule 11 sanctions motion is well settled and has not been rebutted:

- Rule 11 "explicitly and unambiguously imposes an affirmative duty on each attorney to conduct a reasonable inquiry into the viability of a pleading [motion or other paper] before it is signed."[4]

- A court may "impose sanctions not only for a party's 'signing' a paper filed with the district court, but for 'presenting to the court (whether by signing, filing, submitting, or later advocating)' a document that is otherwise sanctionable.[5]

- "The conduct of counsel being judged is measured by an objective standard of reasonableness under the circumstances and subjective good faith is not a safe harbor."[6]

- Upon finding that a Rule 11 violation occurred, the sanctions imposed by a court routinely include requiring

---

[4] *Int'l Shipping Co., S.A. v. Hydra Offshore Inc.*, 875 F.2d 388, 390 (2d Cir.1989) (quoting *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir.1985)); *see also Silberman v. Innovation Luggage, Inc.*, No. 01 Civ. 7109, 2003 WL 1787123, at *15 (S.D.N.Y. Apr. 3, 2003); *Mopaz Diamonds, Inc. v. Inst. of London Underwriters*, 822 F. Supp. 1053, 1057 (S.D.N.Y. 1993); *Durant v. Traditional Invs., Ltd.*, 135 F.R.D. 42, 47 (S.D.N.Y. 1991).

[5] *Dellefave v. Access Temporaries, Inc*, No. 99 Civ. 6098, 2001 WL 286771, at *5 (S.D.N.Y. Mar. 22, 2001) (quoting Rule 11(b)).

[6] *Manhattan Life Ins. Co.v. A.J. Stratton Syndicate (No. 782)*, 132 F.R.D. 139, 143 (S.D.N.Y. 1990) (citing *Eastway Constr. Corp. v. New York*, 762 F.2d 243, 253 (2d Cir.1985); *see also* Fed. R. Civ. P. 11 advisory committee note to 1993 amendments (explaining that Rule 11(b)(2) "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments.")

6

the violating party and/or its attorneys to pay the opposing party's attorneys' fees and costs.[7]

- It is not only appropriate, but also routine, for the party and its attorneys to be held jointly and severally responsible to for the sanctions imposed by the court.[8]

- Rule 11(c)(1)(A) expressly provides that "[a]bsent exceptional circumstances, a law firm shall be held jointly responsible for violations committed by its partners, associates, and employees."

**B.      The Answering Papers Fail To Refute That Zurich And Its Counsel Did Not Undertake A Reasonable Investigation Inasmuch As Information Available To Them Prior To The Commencement Of The Lawsuit Revealed That Zurich's Claims With Respect To The Status Issue Lacked Evidentiary Support**

Zurich and its counsel spent nearly three years litigating the Status Issue.  The Moving Papers demonstrated that Zurich and its counsel knew (or should have known had they undertaken a reasonable inquiry), prior to filing this lawsuit, that the Port Authority Parties were additional insureds under the Zurich binders and policies.  *See* Moving Br. at 2-30.

In opposing the Port Authority Parties' sanctions motion, it was incumbent upon Zurich and its counsel to come forward with evidence demonstrating that they made a reasonable inquiry, prior to commencing this lawsuit, that Zurich's claims with respect to the Status Issue had evidentiary support.  As noted above, neither Coughlin Duffy nor Zurich has submitted *any* evidence demonstrating that they conducted such an inquiry.

---

[7] *Wischmeyer v. Wischmeyer*, No. 05 Civ. 6134, 2006 WL 3257419, at *3 (W.D.N.Y. Nov. 9, 2006); *Profile Pub. & Mgmt. Corp. APS v. Musicmaker.com, Inc.*, No. 01 Civ. 2886, 2003 WL 1785798, at *1 (S.D.N.Y. Apr. 2, 2003); *Dellefave*, 2001 WL 286771, at *6; *Leptha Enters, Inc. v. Longenback*, No. 90 Civ. 7704, 1991 WL 183373, at *4 (S.D.N.Y. Sept. 9, 1991); *Manhattan Life Ins. Co.*, 132 F.R.D. at 143; *Edstrom v. Nat'l Incentive Servs., Inc.*, No. 85 Civ. 3701, 1988 WL 13717, at *1 (S.D.N.Y. Feb. 11, 1988); *Ford Piano Supply Co. v. Steinway & Sons*, No. 85 Civ. 1284, 1988 WL 3488, at *4 (S.D.N.Y. Jan. 13, 1988).

[8] *Gold v. Last Experience*, No. 97 Civ. 1459, 1999 WL 156005, at *5 (S.D.N.Y. Mar. 22, 1999); *Maritime Inspection Servs., Inc. v. Thermo-Vales Corp.*, No. 90 Civ. 7286, 1993 WL 43421, at *1 (S.D.N.Y. Feb. 18, 1993); *King World Prods., Inc. v. Cmty. Broad. of Coastal Bend, Inc.*, No. 89 Civ. 2844, 1990 WL 67399, at *4 (S.D.N.Y. May 17, 1990).

DOCSNY-240562v05

Wiley Rein attempts, but fails to make such a showing.   Specifically, Mr. Brunner declares:

> The interviews of the underwriters referenced in paragraph 5 above and WRF's [Wiley Rein's] review of the documentary record were the basis on which the allegations of the Complaint filed in this action on January 15, 2003 were predicated."

(Brunner Decl. ¶ 9.)

As to the substance of these interviews and the nature of his investigation, Mr. Brunner declares only that he directed Zurich's employees "that all communications relating to this situation should be preserved." Brunner Decl. ¶ 5.  (Interestingly, Mr. Brunner does not declare that he directed Zurich's employees to preserve "all documents relating to this situation." )

More importantly, Mr. Brunner does not disclose: (1) how much time he spent interviewing the underwriters (five minutes? five hours?);  (2) the specific inquiries he made to the underwriters and the information they provided to him (did he ask them whether the coverage they underwrote was intended to afford additional insured status to the Port Authority Parties?); (3) the "documentary record" he reviewed (what was the universe of documents he requested? Did he ask for all prior drafts and versions of the primary policy?); or (4) the specific instructions he gave to Zurich's underwriters with respect to the preservation of "communications relating to this situation." [9]

---

[9] One of the following scenarios must have occurred during the meetings conducted by Mr. Brunner:  (1) a reasonable inquiry was not undertaken and basic questions were not asked, similar to those at the depositions of the Zurich employees which revealed that the Port Authority Parties were additional insureds; (2) the Zurich employees were asked, but refused to admit, that the Port Authority Parties were always intended to be additional insureds; or (3) the Zurich employees admitted that the Port Authority Parties were always intended to be additional insureds but counsel disregarded such information and asserted claims to the contrary.  It is notable that during their depositions, Zurich's employees testified that the Port Authority Parties always were intended to be additional insureds.  *See* Moving Br. at  21-22.  Whether it was the fault of Zurich or its counsel, or both, is of little relevance to the Port Authority Parties - - the

8

Without more, Mr. Brunner's vague statement that the allegations in the Zurich complaint were based on "interviews of the underwriters" and Wiley Rein's "review of the documentary record" is insufficient to demonstrate that Zurich and its counsel undertook a reasonable investigation of Zurich's claims with respect to the Status Issue prior to suing the Port Authority Parties.

**C.    The Answering Papers Fail To Refute The Evidence That Throughout The Course Of This Litigation Zurich And Its Counsel Continued To Take Positions In Pleadings And Other Papers With Respect To The Status Issue That Lacked Evidentiary Support**

The Moving Papers demonstrate that, after commencing this lawsuit, Zurich and its counsel continued to take the position in pleadings and other papers filed with the Court that the Port Authority Parties were not additional insureds under the Zurich binders and policies even though the evidence became overwhelming that this position lacked evidentiary support. The Answering Papers have failed to rebut these showings.

As noted, *supra*, neither Zurich nor Coughlin Duffy put in declarations or affidavits. Wiley Rein attempts to justify the fact that it continued to litigate the Status Issue long after reviewing the Pre-Loss Policy by, on the one hand, blaming an unnamed former associate for failing to bring that document to the attention of a partner and by, on the other hand, arguing that the Pre-Loss Policy was irrelevant. *See* Declaration of Leslie A. Platt ("Platt Decl.") ¶¶ 3, 11. Both excuses are disingenuous. First, under Rule 11(c)(1)(A), absent exceptional circumstances, a law firm is responsible for the acts of its associates. Second, the significance of the Pre-Loss Policy is amply demonstrated by the fact that Zurich stipulated, on April 13, 2005, that the Broad

---

fact remains that sanctions should be imposed as a consequence of dragging the Port Authority Parties through years of unnecessary litigation with respect to the Status Issue.

Form Named Insured Endorsement attached to the Pre-Loss Policy is the endorsement that confers named insured status on the Net Lessees.  Lewis Moving Aff., Ex. 46.

Zurich's central argument in opposing the Port Authority Parties' 12(c) motion with respect to the Status Issue, was that although the Port Authority was the lessor of insured premises the WTCP operating entities which were the lessees (*e.g.*, the Net Lessees) were not named under the policies.  Thus, argued Zurich, discovery was needed to resolve the ambiguities in the primary binder with respect to whether the Port Authority Parties and the Net Lessees were intended to be insured under the Zurich policies.  In an astonishing display of wordsmithing Zurich's Answering Brief argues that "Zurich's inside and outside counsel were not aware of the [Pre-Loss Policy] at the time that Zurich filed its opposition to the Rule 12 motion." Moving Br. at 17.  If that statement is intended to represent that Zurich's inside and outside counsel were not in possession of that document at that time, it is totally false.  Leslie Platt, a Wiley Rein partner, admits that she received the Pre-Loss policy "by mid-March 2003" and that an associate at Wiley Rein (who is no longer with the firm) reviewed the document.¶ 4.  If, on the other hand, the statement is a sly attempt to represent, *without really saying it*, that counsel had not looked at key evidence in its possession,[10] that statement does not get counsel off the hook under Rule 11(c)(1)(A).  Wiley Rein indisputably was in possession of the Pre-Loss Policy *well before the argument on the 12(c) motion, which took place on December 3, 2003.*  Moreover, Wiley Rein actively led this Court to believe that Zurich and counsel had reviewed the available evidence and it did not support the Port Authority Parties' position.  Mr. Brunner, another Wiley Rein partner, represented to the Court during the oral argument:

---

[10] Ms. Platt declares that she cannot recall whether she reviewed the Pre-Loss Policy when she received it.  She also claims that the associate that reviewed the document did not mention it to her.  Platt Decl. ¶ 4

> We have plenty of evidence, that believe me, we can invoke and we have invoked on this issue of whether [the Port Authority Parties are] an additional insured at all.

*See* Moving Br. at 16; Lewis Moving Aff., Ex. 22 at 17-18.

Thus, the argument advanced in Zurich's Answering Brief that the Court's denial of the Port Authority Parties' 12(c) motion demonstrates that Zurich's position on the Status Issue had evidentiary support is simply disingenuous. That argument ignores the fact that, at the time that the motion was briefed and argued, Zurich and its counsel were in exclusive possession of information which demonstrated that Zurich's position on the Status Issue *did not have evidentiary support*, and they withheld that information from the other parties and the Court.

Zurich's Answering Brief concedes, as it must, that the deposition testimony of Zurich employees adduced after the 12(c) motion "provided evidence to support the conclusion that the Port Authority, as lessor, had been intended to be an additional insured." Answering Br. at 26. Zurich's Answering Brief fails, however, adequately to explain why Zurich and its counsel clung to the position that the Port Authority Parties were not additional insureds in the face of that evidence. Indeed, Zurich refused to consent to a judgment stating that the Port Authority Parties are additional insureds under the Zurich Policies until October 2005, long after this Court admonished Mr. Brunner during a December 3, 2004 court conference that "[Y]ou are walking away from the policy . . . ." Answering Br. at 23, Lewis Moving Aff., Ex. 40.

The Port Authority Parties submit that Zurich's and its counsel's real motivation for prolonging litigation of the Status Issue was to exact concessions from the Port Authority Parties on the Scope Issue.

From the outset, Zurich consistently conditioned its acknowledgment of the "possibility" of coverage for the Port Authority Parties to a limitation on the scope of that coverage. *See, e.g.*, Zurich' First Amended Complaint for Declaratory Judgment ¶ 14 ("[T]he Port Authority may be

afforded some coverage under the Policies . . . *but such coverage would be confined to (at most) the Port's vicarious liability for the alleged acts or omissions of the Named Insured.*")[11]; Zurich's Answer, Affirmative Defenses, Counterclaim and Fourth Party Claim ¶ 14 ("As the owner and lessor of the World Trade Center Premises, the Port Authority may be afforded some coverage under the Policies . . . *but such coverage would be confined to (at most) the Port's vicarious liability for the alleged acts or omissions of the Named Insured.*");   Sept. 10, 2004 letter from Thomas Brunner to Honorable Alvin K. Hellerstein ("At this time, Zurich has determined that it will shortly seek to amend the Zurich Pleadings . . . to assert that the Port Authority is to be deemed an additional insured under the Zurich primary and umbrella policies for certain limited purposes. . . .Zurich believes *that 'the scope of such coverage is confined to, at most the Port Authority's vicarious liability* for the Named Insured's [World Trade Center Properties LLC ] actions.'");[12]   Zurich's Revised Initial Contentions at 2, 15, 19 ("Zurich does acknowledge in light of the discovery conducted to date that the Port Authority is for limited purposes an additional insured under the Primary Contracts and an insured under the Umbrella Contracts.  *Such coverage, however, is confined at most, to the Port Authority's vicarious liability for the alleged acts or omissions of World Trade Center Properties LLC.*").[13]

Zurich's Answering Brief admits that even after "discovery supported the fact that the Port Authority was intended to have additional insured status," it "sought to narrow the issues by agreeing that the Port Authority should be deemed an additional insured *with limitations on the scope of that coverage.*"  Answering Br. at 22.

---

[11] Lewis Moving Aff., Ex. 17.

[12] First Lewis Aff., Ex. 37.

[13] First Lewis Aff., Ex. 38.

At the December 3, 2004 court conference, the Port Authority requested that Zurich consent to a judgment that the Port Authority is covered for claims "arising out of the ownership, maintenance and use of the premises," the language used in the Additional Insured – Managers and Lessors endorsement, and defer until the future, as the underlying claims developed, the scope of the coverage provided to the Port Authority under that endorsement. Lewis Moving Aff., Ex. 40 at 13. Zurich's counsel refused because of his insistence that the Scope Issue was bound up with the Status Issue. *See id.* at 16-17.

As Zurich's Answering Brief concedes, no amount of prodding by the Court would move Zurich from this position. Answering Br. at 23 ("The Court 'pushed' Zurich's counsel to agree that Zurich was "bound to the words of the policy and the words of the policy cover claims arising from the ownership, maintenance or use of the demised premises'"). Even after the April 13, 2005 Stipulation between Zurich and WTCP, Zurich refused to consent to a judgment that the Port Authority was an additional insured for all claims "arising out of the ownership, maintenance and use" of the WTC, notwithstanding that the Additional Insured – Managers and Lessors Endorsement acknowledged in the April 13, 2005 Stipulation contains that language. *See* June 3, 2005 letter from Randy Paar to Kevin Coughlin (Lewis Moving Aff., Ex. 47). Only after months of summary judgment briefing did Zurich consent to a an order ("so-ordered" by the Court on October 31, 2005) acknowledging the status of the Port Authority Parties as additional insureds under the Zurich Policies without conditioning the acknowledgment of status on the resolution of the scope issue. Lewis Moving Aff., Ex. 53.

Even if Zurich's position with respect to the *scope of coverage* afforded to the Port Authority Parties was colorable, Zurich's refusal to fully acknowledge the Port Authority Parties' *status* was obviously baseless and motivated by the hope of delaying the case, increasing

DOCSNY-240562v05

the costs for the Port Authority Parties and thus forcing the Port Authority Parties into concessions on the "scope" issue more favorable than otherwise might have been obtained.

Finally, the pleas of purported good faith contained in Zurich's Answering Brief is an irrelevant consideration under Rule 11. *See* 1993 Advisory Committee Note explaining that Rule 11(b)(2) "establishes an objective standard, intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments."[14]

In sum, the unrefuted contentions in the Moving Papers, together with the admissions by Zurich and its counsel in Zurich's Answering Brief, lead to only one conclusion:  The Port Authority Parties were unnecessarily subjected to a long, bitter, and extremely costly lawsuit notwithstanding the fact that all of the information that Zurich needed in order to recognize the their additional insured status was, from the beginning, either in documents possessed by Zurich and its counsel, or known by Zurich's underwriters.

As set forth in the Moving Papers, the courts have consistently held that Rule 11 sanctions are warranted when information possessed by, or available to, the plaintiff and/or its counsel reveals that its claims lack evidentiary support. *See* Moving Br., at 33-34 and cases cited therein.

### D.    Zurich's Procedural Arguments Are Meritless

As an initial fall-back position, Zurich's Answering Brief argues that the sanctions motion is procedurally defective on the grounds that the Port Authority Parties did not comply with the safe harbor provision contained in Rule 11, and the directive that Rule 11 motions be filed separate from other motions.  For the reasons set forth below *infra* at 15-18 and in the Moving Papers at 29, Zurich's arguments are belied by the prior pleadings and correspondence

---

[14] Fed. R. Civ. P. 11 Advisory Committee Note to 1993 Amendments.

DOCSNY-240562v05

in this case (including an exchange by the parties of a demand and counteroffer in the fall 2006 in an effort to settle the sanctions and bad faith issues), Judge Hellerstein's directives, the doctrine of waiver, case law, and simple commonsense.

First, it is wholly undisputed that the Port Authority Parties fully complied with the Court's directives concerning the manner in which the instant sanctions motion was to be initiated and presented to the Court.  At the January 9, 2007 conference, the Court, *inter alia*, (i) set the briefing schedule in connection with the sanctions motions; (ii) stated that it would be "unnecessary" for counsel to the parties to engage in "a period of discussion" prior to  filing  the sanctions motions; and (iii) directed that all arguments relating to sanctions, under Rules 11 and 37, be presented in a single motion. Lewis Moving Aff., Ex. 55 at 13-15.  Indeed, when asked how the motions should be presented, the Court stated "[d]on't break it up.  It's one motion." *Id*. at 15.

Second, to the extent Zurich and Coughlin Duffy are attacking the motion as procedurally defective, their participation, without objection, in the discussions at the January 9, 2007 conference concerning the briefing schedule on the motion, and the form for presenting the motion, constitutes waiver.  To the extent that Wiley Rein is attacking the motion as procedurally defective, it too was on specific notice that the Port Authority Parties intended to move for sanctions.  Zurich's Answering Brief concedes that, by letter dated December 2, 2004, counsel for the Port Authority Parties sent a letter to the Court regarding their intent to seek sanctions against Zurich for costs and legal fees incurred in litigating Zurich's refusal to recognize the Port Authority Parties' status as additional insureds.  Answering Br. at 22.  On December 2, 2004, Mr. Brunner of Wiley Rein sent a proposed agenda to the Court for the December 3, 2004  status conference.  Item III on the Agenda was "Motion for Costs incurred by the Port Authority in

15

Litigating Status Issue conceded by Zurich." Reply Affirmation of Joan Lewis ("Lewis Reply Aff."), Ex. B.

Third, case law confirms that the manner in which the Port Authority Parties initiated and presented their sanctions motion is not procedurally defective. For example, in *Pannonia Farms, Inc. v. USA Cable*, No. 03 Civ. 7841, 2004 WL 1276842, at *10-*11 (S.D.N.Y. June 8, 2004) ("*Pannonia Farms* "), the court held that plaintiff and its counsel were jointly liable for sanctions under Rule 11 despite that defendant neither waited 21 days before filings its Rule 11 motion nor made its Rule 11 motion separate from its summary judgment motion. *Id*. In *Pannonia Farms*, the defendant had written to plaintiff's counsel, five weeks prior to filing the motion, advising of the deficiencies in the complaint and had also received permission from the court to make a sanctions motion under Rule 11. *Id.* at *10. In rejecting plaintiff's argument that defendant's motion was procedurally defective, the court explained that "the purposes of the twenty-one day safe harbor and separate motion requirement have been served" since plaintiff was not deprived of notice that defendants would be moving for sanctions, as well as for summary judgment. *Id.*

Similarly, in *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 480 (S.D.N.Y. 2003), *aff'd*, *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) ("*Jeffreys*"), the court considered defendants' motions for Rule 11 sanctions notwithstanding that defendants neither waited 21 days before filing the motion nor brought such motion separate from its summary judgment motion. The court stated that defendants' failure to comply strictly with the safe harbor provision was "merely technical" since, more than 21 days prior to bringing such motion, it sent plaintiff's counsel a letter outlining their anticipated motion. *Id.* Further, the court rejected plaintiff's contention that defendants' motion should be denied because it requested additional relief apart from Rule 11 sanctions. *Id.* The court explained that it had granted defendants permission to proceed with a

16

joint motion and that "[d]efendants should not be penalized for complying with the Court's order." *Id.*

Like the defendants in *Pannonia Farms* and *Jeffreys,* the Port Authority Parties' motion for Rule 11 sanctions is not procedurally defective, and penalizing the Port Authority Parties for complying with the Court's directives with respect to filing the sanctions motion would be unjust. Here, as in those cases, and as detailed more fully in the Moving Papers at 29, Zurich and its counsel were put on notice at several junctures that a sanctions motion would be filed against them. *See, e.g.,* Dec. 2, 2004 letter from Joan L. Lewis to the Honorable Alvin K. Hellerstein (Kelly Decl., Ex. 15); Apr. 7, 2005 Order (Lewis Moving Aff., Ex. 59) (granting leave to WTCP, Westfield Parties, and Port Authority Parties, after dispositive motions are decided, to propose a schedule for sanctions motion).[15]

Lastly, strict compliance with Rule 11(c) under the circumstances of the instant case would serve absolutely no purpose other than to prolong the instant action and multiply unnecessarily the work needed to be performed by counsel, the parties, and the Court. The purpose of the safe harbor provision is to provide an adversary with notice that a sanctions motion will be filed in the event that it does not withdraw or correct the challenged paper. It would be a meaningless gesture for Zurich to withdraw its complaint against the Port Authority Parties at this point, as the case is over. Similarly, no useful purpose would be served by requiring the Port Authority Parties to break up the sanctions motions into two separate motions, one pursuant to Rule 11 and the other pursuant to Rule 37 and 28 U.S.C.A. § 1927.

---

[15]*See also* Sept. 28, 2004 letter from Donald Burke, Esq. to Court at 2 (Lewis Moving Aff., Ex. 56); Feb. 23, 2005 Opinion and Order Regulating Additional Depositions (Lewis Moving Aff., Ex. 58); Apr. 7, 2005 Order, (Lewis Moving Aff., Ex. 59); Tr. of Apr. 13, 2005 Conference at 23 (Lewis Moving Aff., Ex.60); Tr. of Sept. 18, 2006 Conference at 29 (Lewis Moving Aff., Ex. 61); Tr. of Jan. 9, 2007 Court Conference at 9-10 (Lewis Moving Aff., Ex.55); Jan. 10, 2007 Order Regulating Claims for Sanctions Pursuant to Rule 11 and 37 (Lewis Moving Aff., Ex. 54).

In sum, Zurich's and its counsel's procedural challenge to the sanctions motion should be rejected, and is itself frivolous.

## III.  RULE 37 SANCTIONS FOR DISCOVERY ABUSES ARE WARRANTED FOR ZURICH'S LATE PRODUCTION OF DOCUMENTS AND DESTRUCTION OF DOCUMENTS

The attack on the WTC was an event of unquestionable national significance.  Early on it became clear that the Port Authority Parties would be locked in battle with Zurich over the issue whether they would be covered under the Zurich primary and umbrella policies – which had been issued post-loss – for potentially catastrophic liabilities.  Yet, Zurich and its counsel would have this Court believe that it was entirely reasonable to delay for close to a year after the close of discovery the production of the version of the Pre-Loss Policy that (1) existed on Zurich's computer systems on September 11 2001, before any loss had occurred or anyone had a motive to lie; (2) contained a Broad Form Named Insured Endorsement (an endorsement identified in the primary binder as a coverage extension) specifically tailored to provide named insured status to subsidiaries of WTCP, but which was mysteriously deleted from the primary policy when it was issued post-loss; and (c) contradicted Zurich's position that the Port Authority leased the WTC to entities that were not insured under the primary policy.  Zurich's eventual production of this document in February 18, 2005 changed the complexion of this case.

The first excuse proffered by Zurich and its counsel for the late production of the Pre-Loss Policy is a variant of "the dog ate my homework."  To wit, counsel concedes that they were in possession of the document since March 2003 but claim that an unnamed former associate reviewed the document but "did not report anything to the partner that appeared significant." Answering Br. at 30, 35; Platt Decl. ¶ 2.

18

The second excuse proffered by Zurich and its counsel for the late production of the Pre-Loss Policy is that it was not an important document. Ms. Platt declares that even if she had seen it, it would not have struck her as significant. Platt Decl. ¶ 11. Indeed, she declares, "I still find its relevance obscure." *Id.* It is nothing short of flabbergasting that Wiley Rein seeks to excuse its conduct in delaying production of the document which unraveled Zurich's case by characterizing its relevance as "obscure."

Zurich and its counsel's final excuse for the late production of the Pre-Loss Policy is that it is the Port Authority Parties' fault. It is uncontested that the Port Authority Parties' document requests sought production of, *inter alia*, "all versions or drafts of the Zurich Policies. . . including . . . any endorsement . . . contained or incorporated therein."[16] Zurich responded by stating that it would produce "documents from underwriting files" for the primary and umbrella policies[17] Zurich and its counsel argue that this response was a clear signal to the Port Authority Parties that it would be receiving responsive documents only if they happened to be in the files of Zurich personnel who were responsible for underwriting the policies." Answering Br. at 30. Thus, according to Wiley Rein's logic, Zurich was free to withhold production of Ms. Merkel's files even though they contained underwriting documents and versions/drafts of the Zurich Policy and even though she was Zurich's Chief Underwriting Officer, inasmuch as she was not "*responsible*" for underwriting the primary policy. Platt Decl. ¶ 6. This excuse is nothing more than semantic gamesmanship, and not even factually correct.

---

[16] Document Request No. 1 of The Port Authority of New York and New Jersey and The Port Authority Trans-Hudson Corporation's First Request for Production of Documents From Zurich ("The Port Authority Parties' Document Requests") (Lewis Moving Aff., Ex. 29).

[17] Zurich American Insurance Company's Objections and Responses to the Port Authority Parties' Document Requests at 8-9 (Lewis Moving Aff., Ex. 30).

Moreover, Zurich's and its counsel's argument that the Port Authority Parties somehow acquiesced in Zurich's unilateral decision to produce responsive documents on this limited basis is factually incorrect.  *See* Answering Br. at 30.  After receiving Zurich's responses and objections to the Port Authority Parties' Document Requests, the parties conducted a "meet and confer" on April 29, 2004.  *See* Lewis Reply Aff. ¶17-19.  Zurich was represented at the meeting by Robert Kelly.  *Id.* at 19.  Leslie Platt participated by telephone. *Id.*  The Port Authority Parties expressed their concern that Zurich had not produced all of the relevant underwriting files.  *Id.* ¶20.  Ms. Platt represented that there was one centralized underwriting file maintained by Ms. Maier, which Ms. Platt represented, had been produced.  *Id.*  at 20.  Based on Ms. Platt's representations and pending confirmation by Zurich's deposition witnesses, the Port Authority believed that its concerns had been satisfied and the issue resolved. *Id.*.  The foregoing was memorialized in a May 6, 2004 letter from Donald F. Burke of the Port Authority to Robert Kelly.  *Id.* at at ¶20, Ex. A.  On these facts, it cannot be said that the Port Authority Parties somehow acquiesced in Zurich's decision to withhold production of the Merkel files.  While the Watson Declaration attaches pages of correspondence between Zurich and the Westfield Parties relating to agreements those parties purportedly reached with respect to the Westfield Parties' document requests, those agreements have no bearing on the issue whether Zurich defaulted on its responsibility to timely produce documents responsive to the Port Authority Parties' document requests.

As documented in the Port Authority Parties' Moving Brief, the late production of this document, as well as many other significant documents, such as underwriting guidelines and manuals available to Zurich underwriters in July 2001 for use with general liability policies, were produced by Zurich in no less fourteen separate document productions, *all of which took*

*place after the close of Court ordered discovery.  See* Moving Br. at 20.  Such conduct is *per se* unreasonable.  Zurich's Answering Brief fails to address this issue.

Zurich's Answering Brief also does not address the Port Authority Parties' contention that Zurich spoliated evidence by failing to preserve copies of additional insured endorsements available to Zurich underwriters in July 2001 for use with general liability policies.  The latter endorsements were indisputably relevant.  The primary binder identified an endorsement entitled "Additional Insured Where Required Under Contract or Agreement."  Lewis Moving Aff., Ex. 6.  The primary policy as issued failed to contain such an endorsement.  Lewis Moving Aff., Ex. 13.  As this Court recognized in its June 8, 2006 Opinion and Order Regulating Insurance Obligations, ambiguities or "gaps" in the primary binder were to be resolved by evidence of the usual policy in use by the insurer at the time of the binder.  June 8, 2006 Opinion and Order at 14. (Lewis Reply Aff., Ex. C).

The Port Authority Parties were not able to discover the usual endorsements available to Zurich underwriters in July 2001 to provide additional insured status where required by contract or agreement because these documents were not preserved by Zurich.  Moving Br. at 39-40.  Zurich's destruction of this evidence was prejudicial to the Port Authority Parties.  Zurich's April 13, 2005 stipulation claimed, without a scintilla of evidence, that an endorsement entitled "Automatic Additional Insured" endorsement, which purports to afford limited coverage to the PATH, was the endorsement identified by the primary binder as "Additional Insured Where Required By Contract."  Moving Br. at 26; Lewis Moving Aff., Ex. 46.  The excess following form insurers quickly jumped on the band wagon to adopt this aspect of the stipulation, spawning the need for additional discovery of Zurich's underwriters, discovery of excess underwriters that provided following form coverage, and summary judgment motions as to the limits and scope of

coverage available to the PATH under the Zurich line of coverage.  Despite days of additional depositions and extensive summary judgment briefing, the issue remains unresolved.

Finally, for Wiley Rein to suggest that discovery sanctions are unwarranted since "[i]n a complex and hard fought case, there will surely be errors and oversights" is a disturbing precedent to set for the legal profession.  If this Court were to accept the standard that Wiley Rein seeks to set for itself, and attorneys as a whole, discovery will undoubtedly turn into a game of hide and seek.

**IV.   SANCTIONS AGAINST ZURICH'S COUNSEL ARE WARRANTED PURSUANT TO 28 U.S.C.A. § 1927**

Under 28 U.S.C.A. § 1927, the Court has the authority to require an attorney to satisfy personally the excess costs, expenses, and attorney's fees reasonably incurred when counsel has unreasonably and vexatiously multiplied the proceedings in an action.  As demonstrated in the Moving Papers and above, the instant litigation never even should have been commenced against the Port Authority Parties.  For nearly three years thereafter, Zurich's counsel subjected the Port Authority Parties to a time- and cost-consuming litigation which, as evidenced by documents in Zurich's possession and the deposition testimony of Zurich's employees, was unnecessary.  For such misconduct, Zurich's counsel must be sanctioned.

**V.   ZURICH'S ATTACK ON THE FEE APPLICATIONS LACKS MERIT**

Having failed to rebut the Port Authority Parties' arguments that Zurich and its counsel should be sanctioned for their conduct, Zurich resorts to an attack on the sufficiency of the Port Authority Parties' fee application.  Zurich argues that the fee application should be rejected in its entirety.

The Port Authority Parties' fee application is supported by hundreds of pages of time records of the Dickstein Shapiro Firm (spanning the period July 5, 2003 through October 31, 2005 and two in-house attorneys for the Port Authority, Keith Harris and Shirley Spira, (spanning the time period March 5, 2003 through September 15, 2006). *See* Affirmation of Randy Paar (Paar Mvoing Aff.), Ex. A; Affirmation of Keith E. Harris ("Harris Aff."), Ex. B.

The Dickstein Shapiro bills are supported by contemporaneous time records which specify, for each billing attorney and paralegal: the date that the work was performed, the hours expended, the nature of the work done and amount of fees charged. *See* Paar Moving Aff. Zurich and its counsel do not dispute that the hourly rates charged by the Dickstein Shapiro attorneys are reasonable and fall within the range of rates charged by attorneys at comparable law firms.

While the Port Authority Parties' in-house attorneys do not keep contemporaneous time records, a concerted attempt was made by Mr. Harris and Ms. Spira to fairly and conservatively approximate the amount of time they spent on various tasks. *See* Harris Moving Aff.  No fee application was made for Donald Burke, another one of the Port Authority Parties' in-house attorneys, who spent more than 1,000 hours litigating this action on behalf of the Port Authority Parties.  Lewis Reply Aff. ¶15. Zurich does not dispute that the hourly rates charged attributed to Mr. Harris and Ms. Spira fall within the market rate, hourly legal fee for attorneys of their respective background and litigating experience.

According to the Second Declaration of Robert J. Kelly in Support of Zurich's Memorandum of Law In Opposition to The Port Authority and PATH Corporation's Motion for Sanctions ("Second Kelly Aff."), someone reviewed the time entries and assigned a number or combination of numbers to all the time entries corresponding to the set of objections.  Second

Kelly Aff. ¶ 8.  Mr. Kelly does not identify the mystery annotator, disclose how much time he or she spent evaluating the time entries, or attest to that person's familiarity with the pleadings, discovery and Court conferences referenced in the time entries.

As an over-arching objection, Zurich and its counsel object that the Dickstein Shapiro and the Port Authority Parties' time entries do not adequately segregate time spent on the Status Issue from time spent on the Scope Issue (signified by the penciled annotation "3" along side the disputed entry).  The Status Issue was always the major focus of the Port Authoritiy Parties counsel's work (even if every time entry does not state that the work performed "relates to Status Issue"), particularly after the 12(c) motion and up until the time the Status Issue was concluded by the October 31, 2005 Order.  Lewis Reply Aff. ¶14.  As far as the Related to this objection is their contention that Dickstein Shapiro's use of "block billing" is impermissible.  Both objections lack merit.

As an initial matter, block billing is not prohibited in this Circuit.  *Marisol A. ex rel Forbes v. Giuliani*, 111 F. Supp. 2d 381, 397 (S.D.N.Y. 2000) (citing *Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d 417, 425 (S.D.N.Y. 1999)); *see also Sea Spray Holdings, Ltd. v. Pali Fin. Group, Inc.*, 277 F. Supp. 2d 323, 325-26 (S.D.N.Y. 2003).[18]  While the Courts in this Circuit require that fee applications be sufficiently detailed "to decipher the time entries and determine if the work expended was reasonable," *id.,* they do not require litigants to separate work performed *by issue*.  Such a requirement would be impractical in a complex multi-party litigation such as this case.  Many of the litigation tasks performed in this case simply are not

---

[18]Even where courts have reduced fee applications because of difficulty in determining what tasks were performed or whether the work performed was reasonable, the remedy has been to reduce the fee application by a flat percentage rather than rejecting the entire application.  *See e.g.*, *Marisol*, 111 F. Supp. 2d at 401 (flat reduction of fifteen percent); *Sea Spray Holdings*, 277 F. Supp. 2d at 326 (flat reduction of fifteen percent); *Gonzalez v. Bratton*, 147 F. Supp. 2d 180, 213 (2001) (flat reduction of twelve percent).

susceptible to being parsed neatly between the "Status Issue" and the "Scope Issue." How, for example, does one breakdown between "status" and "scope" the time spent by an attorney reviewing a document production for relevant documents, or reviewing a deposition transcript for relevant testimony, or preparing for or attending a deposition or a Court conference that covers a multitude of issues? For example, Zurich asks the Court to reject the following time entries as reflecting vague or inadequately described fees preventing a determination whether the work performed related to the Status Issue:

- 8/11/03 entry for E. Sherwin (Work on answer to complaint, counterclaims and cross-claims") (6.2 hours)

- 8/14/03 entry of R. Paar ("Work on Answer to Zurich") (3.0 hours)

- 11/19/03 entry of R. Paar (Review of Zurich's opposition to 12(c) motion") (2.0 hours)

- 5/5/04 entry of R. Paar ("Draft of Port's section of 2(e) letter to J. Hellerstein; work on letter to R. Kelly arising out of Meet and Confer") (3.5 hours)

- 5/12/04 entry for J. Lewis ("Prepare for meeting with client to discuss preparation for Simon deposition") (9.8 hours)

- 5/18/04 entry for J. Lewis ("Attend Simon deposition. Draft e-mail to R. Paar re: summarizing key points of same. Telephone conversation with S. Goldstein re: further relevant documents from Simon deposition. Meet with M. Messano re: Live note") (10.2 hours)

- 6/6/04 entry for J. Lewis ("Review transcript of June 3, 2004 Simon deposition. Attend continued deposition) (1.0 hours)

- 6/11/04 entry for J. Lewis ("Attend third day of L. Maier's deposition") (7.50 hours)

While the Port Authority Parties have not been granted access to the time records kept by the Coughlin Duffy and Wiley Rein firms for this case, it would be surprising if these firms separate their time entries by issue. Indeed, less than a month ago, a decision by the Southern

District of New York noted that a billing statement submitted by one of Wiley Rein's clients for Wiley Rein's fees "indicated only the monthly charge for 'professional fess' without any detail from which to determine which attorneys had worked on the matter, their hourly rate, their hours or the tasks they performed. *See Takeda Chem. Indus. Ltd. v. Mylan Labs., Inc.*, Nos. Civ. 8253, 04 Civ. 1966, 2007 WL 840368, at *8 n.7 (S.D.N.Y. Mar. 21, 2007). With this in mind, any critiques to the Dickstein Shapiro Firm invoices appears particularly disingenuous.

More importantly, Zurich and its counsel come to this issue with unclean hands. As discussed *supra*, from the outset, Zurich consistently conditioned its acknowledgment of the "possibility" of coverage for the Port Authority to a limitation on the scope of that coverage. Even today, Zurich and its counsel contend that the issues of scope and status are inextricably intertwined. *See* Answering Br. at 3 ("[T]he issue of coverage has two inextricably intertwined elements: who is covered for what risk."). From the time Zurich commenced this litigation against the Port Authority Parties, until late October 2005, Zurich and its counsel consistently and unreasonably refused to yield on the Status Issue unless and until the Scope Issue was resolved. *Supra* p. 11-12. Simply put, Zurich throughout this litigation has treated the Status Issue as if it was inextricably bound up with the Scope issue. It is inequitable for Zurich and its counsel to now complain that counsel for the Port Authority Parties should have treated them as separate issues for purposes of recording their time. [19]

---

[19]In *Gonzalez*, the court rejected the argument that attorneys' fees should be reduced since plaintiff was not successful on all of her claims. The court rejected the notion of reducing the fees awarded based upon the fact that the claims were " inextricably intertwined and involve a common core of facts or [are] based on related legal theories." *Gonzalez*, 147 F. Supp. 2d at 212 (internal citations and quotations omitted). Moreover, the court noted that defense counsel should not have been surprised by the significant amount of hours worked by plaintiff's attorneys on the case since it was a "direct function of the forcefulness and chosen strategies" of its adversary. *Id.* at 211. Likewise, Zurich's efforts to reduce the amount of attorneys' fees awarded to the Port Authority Parties should be rejected.

26

Zurich's other grounds for requesting that the Court reject the fee application of the Port Authority Parties are unsupported by the facts or law and in some respects are incomprehensible. The following are representative examples.

Zurich nonsensically asks the Court to reject time entries "relating to the issue of Additional Insured status" (signified by the number "1" penciled alongside the entry). *See* Second Kelly Aff. ¶ 8. For example, the 10/14/03, 2/16/04 entries for R. Paar and 4/20/04, 7/19/04, and 7/21/04 entries for J. Lewis have all been annotated with the number "1."

Zurich asks the Court to reject fees attributable to the work performed by Port Authority Parties' attorneys Harris and Spira on the grounds that the fees of in-house counsel are not recoverable. Answering Br. at 39. Zurich cites no case law for this proposition, and, in fact, the case law is inapposite.[20]

Zurich asks the Court to reject the fees billed by Dickstein Shapiro paralegals on the grounds that their work was "clerical/administrative" (signified by the number "7" penciled in alongside the entry). *See* Second Kelly Aff. ¶ 8. The work performed by paralegals assigned to this case included organizing, indexing and managing documents, creating and updating various litigation-related databases, and digesting deposition transcripts for testimony related to the Status Issue. *See, e.g.*, 11/14/03, 11/20/03, 12/15/03, 4/6/04 entries for S. Wood; 5/5/04 and 5/6/04 time entries for J. Boriello; 5/18/04 and 5/25/04 entries for E. Levenberg. This work

---

[20] *See Pittsburgh Plate Glass Co. v. Fid. & Cas. Co. of N.Y.*, 281 F.2d 538, 542 (3d Cir. 1960) (In breach of contract action against insurer, court awards attorneys fees for work performed by retained counsel as well as value of legal services rendered by insured's in-house counsel). Law in this circuit is in accord. *Holmes v. NBC/GE*, 168 F.R.D. 481, 483 (S.D.N.Y. 1996) ("[I] t is well settled that attorney's fees may be awarded to in-house attorneys"). In fact, the Southern District has previously awarded the Port Authority's in-house counsel attorneys' fees. *See Brisbane v. Port Auth. of N.Y. & N.J.*, 550 F. Supp. 222 (S.D.N.Y. 1982).

required a comprehensive understanding of, and familiarity with, the substance of the case. Lewis Reply Aff. ¶8. These fees are fully compensable under New York law.[21]

Zurich also asks the Court to reject time entries reflecting out-of-pocket expenses incurred by attorneys and paralegals ordinarily charged to clients such as, travel, on-line research, taxis to business meetings, late night taxis and meals. *See, e.g.*, 10/17/03, 10/21/03, 11/25/03, 1/14/04 Westlaw Research on-line, 11/4/03 taxi to meet with client, 5/17/04-6/17/04 taxis to attend depositions and meals while attending depositions; 7/12/04-7/16/04 travel expenses to depose Zurich witness in Chicago. Such costs are recoverable.[22]

Zurich asks the Court to reject time entries because on the basis of a "kitchen sink" type objection (signified by the number "5" penciled in the margin of the disputed entry) which, in the opinion of the annotator, reflects "questionable billing practices." Second Kelly Aff. ¶ 8). This objection encompasses five different possibilities (multiple attorneys at an event; block billing; duplicative billing; excessive research; and travel time). It is not possible for the Port Authority Parties to determine, in many instances, to which of these particular practices Zurich is objecting.

Zurich's annotation of the Port Authority Parties' bills appears to have been carried out in a rather hurried slap-dash and insincere fashion and does not deserve to be credited.

---

[21] *Marisol*, 111 F. Supp. 2d at 390-91 (work performed by paralegals managing and organizing documents and maintaining litigation-related databases are fully compensable, especially if the work is customarily billed to fee-paying clients, because they require a comprehensive understanding of, and familiarity with the substance of the case); *see also Rodriguez ex rel. Kelly v. McLoughlin*, 84 F. Supp. 2d at 424; *McKay v. Barnhart*, 327 F. Supp. 2d 263, 270 (S.D.N.Y. 2004).

[22] *Marisol*, 111 F. Supp. 2d at 391-92, 395, 401 ("It is well-settled that attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients. Courts have identified the following non-exhaustive list of expenses as those ordinarily charged to clients, and therefore, recoverable: photocopying, travel, telephone costs, and postage.") (internal citations and quotations omitted).

## CONCLUSION

After all is said and done, the Port Authority Parties demonstrated, and neither Zurich nor its counsel have refuted, that: (1) Zurich and its counsel possessed and/or had access to documents and additional information, prior to commencing the instant lawsuit, demonstrating that the Port Authority Parties are additional insureds under the Zurich binders and policies; (2) despite possessing information showing that Zurich's position on the Status Issue lacked evidentiary support, Zurich and its counsel steadfastly continued to refuse, for nearly three years, to acknowledge the Port Authority Parties' status as additional insureds; and (3) Zurich and/or its counsel engaged in discovery misconduct, which included, *inter alia*, spoliation of critical evidence and belated production of key documents. As demonstrated in the Port Authority Parties' papers, the imposition of sanctions are clearly warranted and the Port Authority Parties should be awarded the legal fees and expenses which they unnecessarily were forced to incur as a result of the instant litigation. Accordingly, the Port Authority Parties respectfully request the relief sought in their Moving Papers.

Dated:    New York, New York
         April 6, 2007

By:    _____
        Randy Paar [RP 5106]
        Joan Lewis [JL 1623]
        Nikol A. Gruning [NG 7022]
        DICKSTEIN SHAPIRO MORIN
          & OSHINSKY LLP
        1177 Avenue of the Americas
        New York, New York 10036-2714
        (212) 835-1400
        Attorneys for Defendants The
        Port Authority of New York and New Jersey
        and Port Authority Trans-Hudson
        Corporation

DOCSNY-240562v05

By: _____/S/_____
    Milton H. Pachter
    THE PORT AUTHORITY OF NEW YORK
    AND NEW JERSEY
    225 Park Avenue South
    15th Floor
    New York, New York 10003
    (212) 435-7000
    Attorney for Defendants The Port Authority
    of New York and New Jersey and Port
    Authority Trans-Hudson Corporation

30